# 19-3949-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



JULIET ANILAO, HARRIET AVILA, MARK DELA-CRUZ,
CLAUDINE GAMAIO, ELMER JACINTO, JENNIFER LAMPE, RIZZA MAULION,
THERESA RAMOS, RANIER SICHON, JAMES MILLENA,

*Plaintiffs-Counter-Defendants-Appellants,*

*and*

FELIX Q. VINLUAN,

*Plaintiff-Appellant,*

*v.*

THOMAS J. SPOTA, III, INDIVIDUALLY AND AS DISTRICT ATTORNEY OF SUFFOLK COUNTY,
OFFICE OF THE DISTRICT ATTORNEY OF SUFFOLK COUNTY, LEONARD LATO, INDIVIDUALLY
AND AS AN ASSISTANT DISTRICT ATTORNEY OF SUFFOLK COUNTY, COUNTY OF SUFFOLK,
SUSAN O'CONNOR, NANCY FITZGERALD,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR PLAINTIFF-APPELLANT AND
## PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS

DRUKER, P.C.
1325 Franklin Avenue, Suite 225
Garden City, New York 11530
516-746-4300

CUOMO LLC
200 Old Country Road,
  Suite 2 South
Mineola, New York 11501
516-741-3222

*Attorneys for Plaintiff-Appellant and Plaintiffs-Counter-Defendants-Appellants*

*and*

SENTOSA CARE, LLC, AVALON GARDENS REHABILITATION AND HEALTH CARE CENTER,
PROMPT NURSING EMPLOYMENT AGENCY, LLC,
FRANCRIS LUYUN, BENT PHILIPSON, BERISH RUBINSTEIN,

*Defendants-Counter-Claimants.*

# TABLE OF CONTENTS

1. TABLE OF AUTHORITIES ……………………………… ii

2. JURISDICTIONAL STATEMENT ………………………….. 1

3. STATEMENT OF FACTS ………………………………….. 3

4. ARGUMENT

**POINT I**

**THIS CASE WARRANTS MAKING
A RARE EXCEPTION TO THE
DOCTRINE OF ABSOLUTE IMMUNITY
AS THE INVESTIGATION, GRAND JURY PRESENTATION
ARREST AND PROSECUTION OF THE APPELLANTS
WERE UNCONSTITUTIONAL *AB INITIO*** ………….. 29

**POINT II**

**AS THE EVIDENCE SHOWS THAT APPELLEE SPOTA
HAD DIRECT PERSONAL INVOLVEMENT IN THIS MATTER
THE COUNTY AND SPOTA WERE NOT ENTITLED TO
SUMMARY JUDGMENT** ………………. 44

**POINT III**

**THE APPELLEES ARE NOT
ENTITLED TO QUALIFIED IMMUNITY** ………… 59

5. CONCLUSION ………………………………………….. 68

6. CERTIFICATE OF COMPLIANCE ……………………… 69

# TABLE OF AUTHORITIES

## Cases

*Anilao v. Spota,* 774 F. Supp.2d 457, 481-485 (E.D.N.Y. 2011) ........................ 61

*Babi–Ali v. City of New York,* 979 F.Supp. 268 (S.D.N.Y. 1997). ..................... 47

*Baez v. Hennessy,* 853 F.2d 73, 76 (2d Cir. 1988) *cert. denied* 488 U.S. 1014. .... 45

*Bailey v. City of New York,* 2015 W.L. 4523196 (E.D.N.Y.  July 27, 2015) ........ 49

*Bailey v. City of New York,* 70 F.Supp.3d 424, 453-454 (E.D.N.Y. 2015), .......... 47

*Betances v. Fischer,* 837 F3d. 162,  (2d Cir. 2016) ........................................... 61

*Board of the County Commissioners of Bryan County v. Brown,* 520 U.S. 397
    (1997).................................................................................................... 45

*Bordanaro v. McLeod,* 871 F2d 1151, 1167 (1ˢᵗ Cir. 1989) ............................... 56

*Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993) ...................................... 30,60

*Carbajal v. County of Nassau,* 271 F.Supp.2d 415, 421 (E.D.N.Y. 2003). .......... 60

*Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir. 2001) ........................................ 61

*City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989)................................. 44

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–25, 108 S.Ct. 915 (1988)....... 48

*Claude H. v. County of Oneida,* 214 A.D.2d 964 (4ᵗʰ Dept. 1995). .................... 46

*Coggins v. County of Nassau,* 2008 WL 2522501, at *7 (E.D.N.Y. June 20, 2008)
    ............................................................................................................... 51

*Collins v. City of New York,* 923 F.Supp.2d 462, 477-478 (E.D.N.Y. 2013) ........ 55

*Fields v. Wharrie,* 740 F.3d 1107, 1113-1114 (7ᵗʰ Cir. 2014) ............................. 31

*Ford v. Kenosha County*, 160 Wis.2d 485 (Sup.Ct. Wisconsin 1991) ................. 31

*Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir. 1991) ................................. 46

*Grandstaff v. City of Borger,* 767 F.2d 161, 170 (5ᵗʰ Cir. 1985) ......................... 56

*Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)
    ............................................................................................................... 32

*Henry v. County of Shasta,* 132 F.3d 512, 5119 (9ᵗʰ Cir. 1997) .......................... 56

*Hickey v. City of New York,* 2002 W.L. 1974058 (S.D.N.Y. August 26, 2002). ... 60

*Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) ................................................ 30

*Jett v. Dallas Independent School District*, 491 U.S. 701, 737, (1989)................ 48

*Mandell v. County of Suffolk,* 316 F.3d 268, 385 (2d Cir. 2003)........................ 45

*McGhee v. Pottawattamie County,* 547 F.3d 922, 932–33 (8th Cir.2008)............ 32

*Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–
    691 (1978). ............................................................................................. 44

*Moore v. Valder,* 65 F.3d 189, 194–95 (D.C.Cir.1995) ...................................... 32

*Morse v. Fusto,* 804 F.3d 548 (2d Cir. 2015) .................................................... 61

*Sheff v. City of New York*, 2004 WL 594894 (SDNY 2004).............................. 29

*Shmueli v. City of New York,* 424 F3d 231, 236 (2d Cir. 2005) ......................... 60

*Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir. 1998) ............................................ 60

*Stump v. Sparkman*, 435 U.S. 349 (1975) ........................................................ 31

*U.S. v. Campos-Serrano,* 404 U.S. 293 (1971) ................................................. 41

*U.S. v. Wiltberger*, 18 U.S. 76 (1820).............................................................. 41

*Walker v. City of New York,* 974 F.2d 293, 296 (2d. Cir.1992) *cert. denied* 507 U.S. 961 ............................................................................................... 45

*Walker v. Clearfield County District Attorney,* 413 Fed. Appx. 481 (3d Cir. 2011) .............................................................................................................. 65

*Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) ............................................ 67

*Zahrey v. Coffey,* 221 F.3d 342, 349, 354 (2d Cir.2000).............................. 32,60

## Statutes

42 U.S.C. § 1983 ............................................................................................... 30

Public Officers Law § 2...................................................................................... 46

## Other Authorities

Bidish Sarma, *After 40 Years Is It Time to Reconsider Absolute Immunity for Prosecutors*, American Constitution Society, July 19, 2016 available at https://www.acslaw.org/expertforum/after-40-years-is-it-time-to-reconsider-absolute-immunity-for-prosecutors/............................................................... 30

Evan Bernick, *It's Time to End Prosecutorial Immunity*, Huffington Post, August 12, 2015, available at https://www.huffpost.com/entry/its-time-to-end-prosecuto_b_7979276 ................................................................................. 30

Frederic Block, *"Let's Put an End to Prosecutorial Immunity"* The Marshall Project, March 13, 2018 available at https://www.themarshallproject.org/2018/03/13/let-s-put-an-end-to-prosecutorial-immunity .............................................................................. 29

Mark Niles, *A New Balance of Evils: Prosecutorial Misconduct, Iqbal, and the End of Absolute Immunity*, vol 13 Stanford Journal of Civil Rights and Civil Liberties 137 (2017) ............................................................................... 29

## Rules

Fed. R. Evidence 201(b)(2), (d) .................................................................. 51

Federal Rules of Appellate Procedure, Rule 4 ...................................... 1

Rule 4 of the Federal Rules of Appellate Procedure ............................ 1

F.R. Civ. P. 12(b)(6) ............................................................................ 1

# JURISDICTIONAL STATEMENT

This appeal arises from a Judgment of the United States District Court for the Eastern District of New York (Block, J.), dated October 28, 2019, which was the final order dismissing the case. This Court has jurisdiction to hear the appeal pursuant to Rule 4 of the Federal Rules of Appellate Procedure because the Notice of Appeal was filed on November 25, 2019, and a subsequent Notice of Appeal was filed on November 26, 2019.

# INTRODUCTION

The Appellants seek a reversal of an order granting summary judgment to the Appellees THOMAS J. SPOTA, III, Individually and as District Attorney of Suffolk County; OFFICE OF THE DISTRICT ATTORNEY OF SUFFOLK COUNTY; LEONARD LATO, Individually and as an ASSISTANT DISTRICT ATTORNEY OF SUFFOLK COUNTY; COUNTY OF SUFFOLK ("Appellees"), and the prior order dismissing certain causes of action pursuant to F.R. Civ. P. 12(b)(6). The Appellants are ten Filipino nurses who were arrested and prosecuted because they chose to quit their jobs at a nursing home operated by Sentosa Care LLC. The other Appellant, Felix Vinluan, is a Filipino-American lawyer who had been asked by the U.S. Philippine Consulate to provide legal advice and consultation to the nurses.

This case appears to be one of first impression. Appellants seek to challenge the absolute and qualified immunity granted to law enforcement officials in general, and to these Appellees in particular. Unlike Appellants in any prior case, the Appellants here were arrested and prosecuted after the county's chief law enforcement official held a private meeting with the complainants and their politically influential attorney. Earlier, the Suffolk County Police Department and two other governmental agencies with jurisdiction over the matter had previously determined that no criminal conduct or civil violations of the rules regarding Nurses' conduct had occurred.

Nevertheless, the Suffolk County District Attorney Thomas J. Spota III ("Spota") and his chosen "special projects" prosecutor, Assistant District Attorney Leonard Lato ("Lato") opened a six-month investigation into the matter that culminated in a Grand Jury presentation wholly engineered by Lato containing substantial legal error and fraud. In fact, Lato admitted that, finding no directly applicable law under which to charge the Appellants, he essentially crafted his own law, which was contrary to and not supported by any precedent. That "law" formed the basis of his instructions to the Grand Jury and, therefore, the indictment itself.

The Appellate Division, Second Department, in reviewing the indictment and granting the Appellants' writ of prohibition, found that the Grand Jury presentation and subsequent indictment were unconstitutional *ab initio* because the

charges violated the United States Constitution's prohibition against slavery and involuntary servitude embodied in the Thirteenth Amendment, and also violated Appellant Vinluan's First Amendment right to free speech and free assembly.

The District Court dismissed all causes of action against Lato, Spota and Suffolk County, granting them absolute and qualified immunity. This should not be allowed to stand in this case as the government's overreach in indicting and prosecuting the innocent nurses and their lawyer should not be protected by the law.

## STATEMENT OF FACTS

Appellants are all natives of the Philippines. Felix Vinluan is a naturalized attorney admitted to practice in the State of New York. The remaining Appellants ("the Nurses") were trained as nurses and/or physicians in the Philippines. The nurses were all recruited to come to the United States to work as nurses in facilities owned and operated by Sentosa Care LLC. While they were promised that they would be directly hired by their petitioning employer, and all signed contracts with certain specific Sentosa facilities, the Nurses were placed for employment as agency nurses through Prompt Nursing Employment Agency at a facility in Suffolk County called Avalon Gardens which was operated by Sentosa. None of the Appellant Nurses was hired by his or her petitioning employer, and none signed a contract with Avalon. Some of the nurses were placed to care for patients

in two pediatric units. The patients in one unit required ventilators; those in the other unit did not. Shortly after their employment began, the nurses had issues with their employment conditions. For example, Appellants were frequently shorted hours; they were not paid overtime when due; they were not paid night shift differentials promised to them. (A964-965, 973-975, 1004, 1024-1025, 1052-1053, 1093, 1121)[1]. Most significantly, the Nurses repeatedly complained about short staff on the units, particularly the Pediatric Units that, in their opinion, endangered the patients for whom they were caring (A961, 999-1000, 1021-1024, 1073, 1093-1094, 1096-1097, 1118-1119). The Appellants had many other complaints that they brought to Prompt and Sentosa's attention, but that went unaddressed.

Other Filipino nurses working in other Sentosa-affiliated facilities, who also felt that their contracts had been breached and that promises made to them had been broken, joined with the Avalon nurses in contacting the Philippine Consulate in New York, to request assistance from their home country. The officials at the Consulate referred them to Appellant Vinluan. In 2006, Vinluan had a successful practice specializing in immigration and corporate issues (A1183). He charged each nurse a nominal fee of $100 for representation regarding their contract

---

[1] Parenthetical references are as follows: references to the Appendix are designated by "A" and a page number; References to the Sentosa Summary Judgment Papers are designated "Sentosa" with an Exhibit letter.

disputes with Sentosa (Exhibit BB 54), and the Appellants retained him (A1199). At the behest of the Philippine Consulate, Appellant Vinluan undertook an investigation of the nurses' complaints (A1191, 1199-1200).

Vinluan advised the nurses that, in his opinion, their contract had been breached by the employer. The nurses did not work for any facility, including Avalon. They were employed by the Prompt Employment Agency, with which they had not contracted. Vinluan advised that, if they elected to resign, they would not be liable for the $25,000 penalties set forth in their contracts (A1187-1188, 1194-1195). Vinluan did not advise them to resign, nor did he advise them of how to resign (A951-952). He specifically informed the nurses that if they chose to exercise their right to resign, they must complete their shifts before leaving their employment (A1196, 1214-1215, 1216, 1219).

In addition to advising the nurses of their legal rights, Mr. Vinluan offered to represent them in filing a complaint with the Office of the Chief Administrative Hearing Officer (OCAHO) concerning what he regarded as discrimination against the Prompt-employed nurses by Sentosa (A1211-1212). On April 6, 2006, Mr. Vinluan drove to Washington, D.C. to personally file the complaints with OCAHO (A1197-1198).

On the morning of April 7, 2006, Appellants Theresa Ramos and Rizza Maulion arrived at Avalon to commence their 7 a.m. to 7 p.m. shift in the pediatric

vent unit.  Nancy Fitzgerald, the Avalon director of nursing, informed them that one of them had to go home, and return later to work a vacant night shift.  Both nurses protested (A1055-1056, 1098-1099).  Both pointed out that the schedule would lead to three shifts covered only by one nurse – the Friday morning shift, the Friday evening shift, and the Saturday morning shift, since Appellant Maulion, who was scheduled for that shift, could not work it if she worked all night (A1223).  Appellants Ramos and Maulion asked Fitzgerald to acknowledge, in writing, receipt of a letter that they had drafted, detailing their objections.  When she refused, it was signed by another supervisor (A1059-1061, 1223).

Appellant Maulion ultimately left the facility as directed by Fitzgerald but refused to return for the night shift.   Appellant Maulion was told that if she did not return, she would be fired (A1055-1056).  On April 7, 2006, between 3:00 and 5:00 p.m., the other Appellant nurses gave letters of resignation to Fitzgerald, and sent copies of the letters by fax to Prompt, their employer (A1225-1234).  Appellant Ramos also submitted a letter of resignation, but completed her shift, and worked four additional hours, until a replacement nurse arrived to care for the patients, before her resignation became effective (Exhibit M 74, 84-85).  No nurse walked off a shift, and there was no instance in which there were no nurses to care for a patient. Every shift was covered.

Simultaneously with the filing of a civil complaint against all Appellants in the Nassau County Supreme Court ("the Nassau Lawsuit") (which was subsequently dismissed), Avalon wrote a letter to the Department of Education complaining about the resignations and seeking to have the nurses' licenses and/or limited permits revoked (A1162-1164).

After completing their investigation, the Department of Education determined that the nurses had not committed any professional misconduct, either by abandoning a patient, or their employer. The nurses were exonerated, and the complaints against them were dismissed. (A1280).

At the time of these events, Howard Fensterman, the attorney for Sentosa, was a prominent and influential attorney on Long Island, serving as the Long Island Fundraising chairperson for Senator Charles Schumer (A1297, 1315, 1320). Fensterman secured a personal meeting with Sentosa owner Bent Philipson and Senator Schumer regarding the suspension of Sentosa Recruitment Agency's license to recruit nurses in the Philippines, based on a complaint made by Appellants. Senator Schumer wrote three letters to the government of the Philippines, the last of which was to the President of the Philippines. As a result of these letters, Sentosa Recruitment's license was restored, and the investigation was aborted (A1326-1329).

Avalon's executive director, Susan O'Connor, went to the local police precinct to file a report and to have the nurses arrested (A1243, 1316). The police assigned the complaint to the crime control unit, which seeing no evidence of criminality, took no action (A1345-1346, 1348, 1371).

With a single telephone call to the District Attorney's Office, Mr. Fensterman was able to schedule a personal meeting with Spota (A1341).

The meeting with Appellee Spota took place on May 31, 2006. Fensterman, O'Connor, Philipson and his business partner, Ben Landa, as well as Sentosa Recruitment principal Francris Luyun, attended the meeting (A1245, 1359). The meeting lasted approximately 45 minutes (A1342).

As a result of the meeting, an investigation was opened into Mr. Vinluan as well as the resignations of the Nurses. Spota assigned Appellee Lato to prosecute the case. Spota then telephoned Fensterman to report on his office's progress and his plans regarding the prosecution. After a subsequent meeting in the office to introduce Lato and to discuss the investigation, Fensterman, Spota, Lato and DA Investigator Walter Warkenthien dined at a local restaurant, with Fensterman paying for the meal. Lato professed to have paid no attention to what Fensterman said at the meeting and lunch but did recollect that Fensterman "threw Felix Vinluan's name around" (A1318-1319, 1366, 1369-1370). In fact, the evidence showed that Vinluan was a particular target of Philipson. Thus, in the Nassau

lawsuit, Vinluan was included as a defendant along with Juno Healthcare Staffing

Systems, Inc., a former client of Vinluan's in the nurse recruitment business.

Explaining why Mr. Vinluan was included, Mr. Philipson asserted, in an

examination before trial in that action:

> Somebody did [induce the resignations] and <u>we believe</u> that he had his
> fingerprints all over it.  And being that he was and still is in direct
> competition with us in trying to recruit nurses from the Philippines, <u>we
> believe</u> he had an ulterior motives [sic] here as well and, you know, that's
> what we believe (A1261-1262). [Emphasis added].

Similarly, in a meeting that Philipson held in one of Sentosa's other facilities

to try to ensure that no other Filipino nurses resigned, a transcript of which was

included in the Appellants' opposition to the motion for summary judgment,

Philipson said, among other things:

> **BP:**  (u/i) walked off shifts and abandoned (u/i) one, two, three just for your
> information, and if you have an open communication with them, it's good to
> get their words back to them because I know they just, they're young.  They
> just started off their careers here in the United States.  They took a wrong
> turn.  <u>Somebody misled them.  Who—we know already who misled them.
> We are fully aware.  And we are going to go after that person as well</u>.
>
> …
>
> You know, we were the first agency in the Philippines that didn't charge
> anybody a penny.  And since then, a lot of people have—you know, in order
> to compete with us—have followed suit.  <u>Here you're dealing with, actually,
> another Filipino agency and a lawyer who is trying to recruit these nurses
> and is just trying to make money off them.  And this lawyer himself is going
> to be in trouble because he's interfering with our contract—which is, again,
> illegal.  And for a lawyer to do that is stupid because he can lose his license
> to practice law in the United States as well, which I don't know why they're
> doing that, quite frankly speaking</u> (A1282-1288) (emphasis supplied).

In the course of his investigation, Lato personally interviewed a number of the nurses as well as Attorney Vinluan, falsely telling them that the interviews were routine and needed to close the investigations (A1062-1063, 1372). According to Lato, Vinluan became a target of the investigation when Vinluan allegedly "lied" about driving to Washington D.C. to file the petitions with OCAHO. Lato claimed that Vinluan stated that he drove to Washington, because he did not know the address of OCAHO. Lato characterized this as a "lie" so transparent as to be "almost laughable" (A1387-1388, 1390-1391).

Vinluan provided Lato with a copy of the decision of the Department of Education exonerating the Nurses, and with a copy of the decision of the Nassau County Supreme Court denying the application by Sentosa for an injunction, finding that Sentosa had no likelihood of success in the civil action against Appellants (A1203-1204). Lato did not to present these findings to the Grand Jury, allegedly upon the ground that they were inadmissible and would mislead the grand jury (A1393).

Instead, Lato made a wholly skewed and contorted grand jury presentation. Indeed, all of the Sentosa witnesses who testified before the Grand Jury stated that they had hardly met Lato before they testified and were not even prepared as to what questions they were to be asked. (Sentosa Exhibit A 127-128, Sentosa Exhibit C 208-209, Sentosa Exhibit J 510).

The grand jury presentation was fraught with false testimony, misstatements of the law, and refusals by Lato to answer Grand Jurors' legitimate inquiries into areas that would likely have exonerated the Appellants. Moreover, Lato failed to present any of the exculpatory evidence that he possessed, or of which he was aware.

Lato commenced the presentation by telling the Grand Jurors that this was a case about nurses "abandoning patients" (A379-381). The Grand Jurors immediately inquired about the contract dispute. One stated: "I need to know both sides because there is only so much somebody can eat, you know" (A383). However, Mr. Lato utterly failed to ensure that "both sides" were fairly presented.

As often as possible, Lato stated that the nurses had "walked out" (*See, e.g.,* A379-381, 498-499, 500, 501-502, 523-524, 596, 604-605, 609-611, 623). At the beginning of the presentations, one of the jurors specifically asked about this word usage, stating: "He [Investigator Warkenthien] used the term 'walked out' several times which seems to indicate they walked out in the middle of their shifts. I would like to know if they did in fact walk off the job during their shift" (A500). Knowing that the honest answer was that not a single nurse had left during his or her shift, Lato declined to clear up the confusion, stating that the jurors would have to "get that from somebody else." *Id.* Thereafter, adding to the prejudice, and creating a false impression, Lato continued to use the term "walked out" frequently

when referring to the resignations.  This led the grand jurors to use the same improper and inaccurate terminology (A610).  Lato acknowledged that, on several occasions, the grand jurors asked whether anyone had walked off a shift, to which he did not respond

In what can fairly be characterized as a concerted effort to commit perjury, all Sentosa affiliated witnesses contrived false stories for the grand jury regarding the nurses' pay and working conditions.  Lato knew, or should have known, that much of this testimony was false.  Indeed, simple mathematics put the lie to the Sentosa defendants' contentions relating to the nurses' pay after the February 2006 prevailing wage increase.  First, Philipson falsely testified that, following an increase in the "prevailing wage" in February 2006, the nurses had earned more money despite a concomitant reduction in hours (A450).  In actuality, their pay was decreased by $33 per week, resulting in their receiving less than their contracts called for (A859-933).  Additionally, all of the contracts mandated 37 ½ hours of for the Nurses, but the Nurses' hours were cut to 33 hours per week to avoid the mandated pay raise. (*Id*.) Philipson and Susan O'Connor also embellished the number of shifts available to the nurses at the time that they quit.  Philipson testified that, after the change, the nurses worked a "three-shift week, then a four-shift week" (A487).   Susan O'Connor testified that there was one four-shift day per week, and there "was always an opportunity for picking up an extra shift, you

know, very, very often" (A511). In fact, as both Philipson and O'Connor knew, this was untrue. According to the memo disseminated by Avalon, the nurses were only permitted to schedule themselves for three shifts a week, and the nursing staff would cover "missing shifts" (A1179). On April 7, the solution to covering the "missing shifts" was made clear to the nurses: no one was afforded overtime, and the facility, rather than supplying adequate staffing, insisted that the nurses work alone for three consecutive shifts. Nancy Fitzgerald testified that two nurses were required for the vent unit (A561), but she failed to inform the Grand Jury that the unit was deliberately short-staffed for the three shifts on April 7-8. Although the District Attorney's office possessed the schedules showing gaps, and Investigator Warkenthien testified that Appellant Rizza Maulion told him about having been sent home, and having been told to return for the night shift to work by herself (A586-587), Lato's presentation glossed over the short-staffing in an effort to vilify the nurses and acquit Avalon, Prompt and Sentosa of any wrongdoing.

O'Connor rendered patently false testimony to the grand jury about the availability of other experienced vent nurses within the facility, and about the assignments of the nurses. She claimed that Appellant Mark Dela Cruz was trained for the vent unit, despite the fact that, at his own insistence, Mr. Dela Cruz had never worked in that unit. Ms. O'Connor admitted in her deposition that this testimony was "inaccurate". Similarly, Harriet Avila never worked with the vent

patients (A966).  Furthermore, O'Connor's claim that there were no other nurses in the facility who ever worked on the vent unit, and that upcoming vacations prevented alternative staffing (A517), is demonstrably false, as can be seen by a glance at the schedules in the hands of the DA at the time of the presentation (A1153, 1155).  There were eight nurses assigned to the vent unit and ten assigned to the non-vent unit.  An additional nurse was on maternity leave and another only assigned to one shift during the period.  On April 7, when Rizza Maulion was fired and forced to go home, Ms. Ramos was forced to work alone, Nancy Fitzgerald informed her that the nurses on the non-vent unit (with their own patients in need of constant care) would also cover the vent unit.  Obviously, these were nurses who knew the vent patients, and were available to cover shifts.

Regarding the "supervisory" responsibilities of the nurses to whom supervisor badges were given, O'Connor falsely claimed that those nurses actually functioned as supervisors (A541).  This is in stark contrast to what she told the Department of Education, when they inquired about why limited permittees, who were required by regulation to be supervised by an RN, were designated as supervisors. Her response to them was that the designation was due to the union contract, and that it had no basis in reality (A1277).  O'Connor's dishonest testimony confused the grand jurors, who wanted to know if all the "supervisors quit," and why so many (six out of ten) were supervisors (A532-534).  Lato failed

to provide any response that might clear up the obvious confusion caused by the perjury. He also failed to make any attempt to verify any of the facts elicited by him from O'Conner and, indeed, any Sentosa witness.

Nancy Fitzgerald and Susan O'Connor also lied to the grand jury about the nurses' prior grievances, claiming that the resignations occurred "out of the blue," and that there had been no prior complaints. O'Connor deliberately failed to mention the prior complaint letters received from the nurses, as well as the prior complaints made to her in person. Thus, when asked whether any of the nurses had requested "a meeting to air out complaints," O'Connor replied: "Not to me" (A506). She stated that the meeting in the facility was initiated by Philipson, who "did not say why" he wanted to meet with the Filipino nurses. She characterized it as one of the meetings held "periodically" (A504). When asked if the nurses had threatened to "walk out" if their issues were not addressed, she disingenuously stated: "No, not at the meeting." Of course, an earlier letter delivered to her and to Mr. Philipson had threatened precisely that (A1169-1170), but that letter was not provided to the grand jury. Clearly, the truth did not comport with the impression that Lato and Sentosa were trying to create: that the nurses were treated fairly and had left only for the promise of better jobs dangled in front of them by Mr. Vinluan. It was an impression that all knew to be false.

Luyun's testimony before the grand jury was untruthful from beginning to end, with Lato vouching for and encouraging the falsehoods. First, Luyun claimed that, when he learned of the nurses' resignations, he "dialed at least ten numbers just to get somebody to work and I was able to pull some nurses from another facility that have some idea on how to work the ventilator and cover that shift…." (A653). However, in his deposition in the original civil matter, he testified that he made no such telephone calls, nor did he procure any replacement nurses (A1291). In addition, in the grand jury Luyun falsely defined "direct hire" as recruiting only for Sentosa homes (A647) and claimed that the nurses had contracted with "Sentosa Care" (A648). In contrast, in his deposition, he correctly defined "direct hire" to mean hiring by a facility, rather than by an agency (A1293). Despite this previous testimony, Luyun's primary role in the grand jury was to relate contrived falsehoods about Felix Vinluan. In contrast to Lato's frequent instructions to witnesses to avoid hearsay (when that alleged hearsay hurt Lato's presentation), Luyun was allowed to include blatant hearsay in his testimony, much of which appears to have had no basis in reality. Several times he quoted unidentified "nurses" whom he claimed had called him to complain about flaws in the agencies for which Mr. Vinluan allegedly recruited (A654-655, 657, 660-661)(Vinluan recruited for no agencies at all in reality). Luyun also claimed to have spoken to "one of them, the one from another facility, that there was a job offer for them, that

he could secure a job" (A402). He further testified that another unidentified nurse had stated that she was "pressured" to resign (A403). When a grand juror asked Lato whether he knew "of any of the nurses that left and went to work for Vinluan's organization," Lato falsely replied: "Yes" (A658). Lato well knew that this was not the case because he had then current employment information in his file for each nurse, reflecting that none worked for Vinluan or any of his alleged clients. His files contained subpoenas for their employers (A1377-1378). When asked to explain why Luyun was permitted to testify to hearsay, Lato had no credible explanation (A1389, 1395). He allowed Luyun to falsely testify that Vinluan had advertised in the Philippines as a nurse recruiter, when Lato had Mr. Vinluan's advertisement in his files, and well knew that Vinluan's advertisement related only to his services as an immigration attorney (A1554-1555).

Luyun's testimony is particularly egregious because more than six months prior to the grand jury presentation, the Nassau County Supreme Court had ruled that the Sentosa-related entities had no likelihood of success on the merits of the claim that Mr. Vinluan interfered with their contractual relationship with the nurses (A1266-1269). In addition, prior to the presentation to the grand jury, the case was dismissed against Juno, one of the entities that Luyun identified in the grand jury as an agency with which Mr. Vinluan was affiliated. The dismissal was on the explicit ground that there was no legal basis for any action against Juno. Thus, at

17

the time of his grand jury appearance Luyun well knew that his material testimony was false.

Lato inexplicably presented the testimony of Sarah Lichtenstein, Sentosa's civil attorney. Lichtenstein testified about the scramble to file the first lawsuit because, as Mr. Lato elicited, it provides a "tactical advantage" to get to Court first (A599-600). She also erroneously testified that there was "no material difference" between the sponsoring entity and the entity to which the Appellants were assigned to work (A603-604). By the time she testified, she, as the principal attorney handling the litigation for the Fensterman firm, was aware of Judge Bucaria's decision as well as the dismissal of the case against Juno. In addition, it was she who had faxed Mr. Vinluan's advertisement to Lato.

Lato also ignored a number of salient questions from Grand Jurors, who were clearly interested in learning whether the nurses had legitimate grievances that led to their refusal to continue working at Avalon. After Philipson's testimony, the suspicion of the Grand Jurors was apparently aroused, and the following exchange took place between Lato and a very intuitive Grand Juror:

> GRAND JUROR: Does he [Philipson] plan on going back to the Philippines and doing any more recruiting?
>
> MR. LATO: Why would that ….
>
> GRAND JUROR: Because if he's using the District Attorney as a bargaining chip.

I'm just saying now, during contracts, if he's going to say, listen, if you fail to show up there could be criminal charges against you.

MR. LATO:  I can't ask him that question because it's not pertinent.  I understand what you are saying.  That's the type of thing that there is some type of arrangement between the District Attorneys' office and him.  I'll have to have Tom Spota testify which is not going to happen, you know.  (A483-484).

A juror also asked whether Philipson knew why the nurses had resigned because "if he's running the show there.  Some type of responsibility what is going to happen in the future" (A486).  Lato promised that such testimony would come from Susan O'Connor, but she, too, denied knowledge of the numerous complaints communicated by the nurses to her and to Nancy Fitzgerald (A506).

In order to distract the grand jurors from their legitimate questions about the nurses' working conditions, Lato presented excessive and inflammatory evidence regarding the medical conditions of the residents on the vent and non-vent units. There were four separate witnesses to regale the jurors with the details of the children's conditions, accompanied by enlarged color photographs of the sick children (A1381).  This was obviously done solely to inflame the jurors' passions, and to distract them from the many legitimate questions that arose regarding whether the nurses were justified in quitting.

Mr. Lato's rendition of the law to the grand jury was, if anything, worse than his distortion of the facts. When asked if the defendants would all be charged "exactly the same," Mr. Lato stated as follows:

> … there is a statute basically called acting in concert. And you have the same federal law as well called aiding and abetting. But essentially if three people are responsible for one person acting in a certain way, all there are liable as if they had done it themselves. So, in other words, by way of example, say a person by the name of Joe, I want Joe to go rob a liquor store. And my assistant also wants Joe to rob the liquor store, all three of us are liable even though Joe is the only one who physically did the robbery…. For instance, if we are all doing this together, we are in a group, everyone is responsible for what the other person does. *And the theory of, again, if we are all in it together, conspiracy, each person is liable for the acts of his co-conspirator or agent.* (A1571-1572). (Emphasis added).

This, of course, is not the law of New York, because, unlike the Federal system, New York does not hold co-conspirators liable for acts in furtherance of a conspiracy.

Mr. Lato's erroneous post-presentation charge on the law clearly showed the effect of his deliberate refusal to apprise the grand jury of the earlier decision of the Department of Education exonerating the nurses from the very charges the grand jury was considering.

Lato read, without any explanation, the section of the Education Law that defined unprofessional conduct. The indictment read that a nurse committed unprofessional conduct when "the nurse abandoned a patient without making reasonable arrangements for the patient's continued care or when the nurse

abandoned <u>employment at a healthcare facility</u> without giving reasonable notice to the facility <u>and under circumstances that seriously impaired the delivery of professional care to the patients</u>" (A563) (emphasis added).  Although Lato attempted to conceal this salient legal principle, the delivery of professional care to the patients was not seriously impaired, as the Sentosa defendants have repeatedly admitted, and as the Department of Education specifically found.  In addition, Lato charged the jury on patient abandonment, although he knew that no patient was abandoned within the meaning of the regulations.  He also knew that Thess Ramos had stayed for four hours, after her shift ended while waiting for her replacement to arrive (A1111-1112).  When charging the jury about reasonable notice, Lato simply told them it was a question of fact, without providing any guidance as to what factors to take into account (A733-734).  Lato improperly conflated employer abandonment with patient abandonment, reading a notice requirement for employer abandonment and implying that it was for patient abandonment.

Perhaps of even greater significance is that the nurses were not "employed at a healthcare facility."  Rather, they were employed and paid by "Prompt", an employment agency that placed them at Avalon.  As agency nurses, they had no obligation to give any notice to Avalon or, for that matter, to Prompt.

Lato read the definition of aiding and abetting from New York Penal Law §20.00, but then gave another erroneous charge that co-conspirators are liable for each other's crimes (A738-740).

Lato also gave a charge on "conscious avoidance" (A737-738). This led to the following exchange with a Grand Juror:

GRAND JUROR: In regard to blind willfulness, if they inquired that, let's say the abandonment – can I talk about the case?

MR. LATO: Yes.

GRAND JUROR: And they inquired to their legal representation, Mr. Vinluan, now is that blind willfulness anymore because they inquired and maybe said no it's not abandonment? I mean at what point these people are ignorant on the law, I'm going to assume so, they are asking a lawyer and he guides them the wrong way. Now, they have taken the time out to ask him, is that abandonment, and he says no. Where is their obligation at that point?

MR. LATO: That's for you to decide. True, this could be something for a person who is unsure of abandonment, and they ask another person whether in fact it is abandonment. Now, one thing that could be different in this case is, for instance, if Mr. Vinluan is involved in the case and has a vested interest, that is something for you to consider. On the other hand you are right, because sometimes people are unsure what they are doing is criminal. And they ask advice and you may in fact determine in this case that the nurses were worried about abandonment and they asked somebody and were told and actually believed that it would not be abandonment and yes there has been some evidence here that in fact the nurses said they inquired of Mr. Vinluan and whether he gave them and honest opinion that's for you to decide. *But also there is other evidence in this case that where the nurses actually walked out, the director of the facility said you can't, I have all these sick children.*

So, in other words, you have to determine whether, you know, in this particular case what they actually believed to be the case. That's all. I can't help you. It's a question of fact. You are right sir, it's something for you to consider. (A742-744).

Thus, Lato gave the grand jury no guidance on the law regarding advice of counsel. He also gave an improper rendition of the facts, because there was no evidence that Susan O'Connor had said any such thing to the nurses, nor was there any evidence from which the grand jury could conclude that Vinluan had a vested interest in the case.

Lato also improperly charged the grand jury regarding patient and employer abandonment, and regarding endangering the welfare of a minor, or physically disabled person. Lato had available to him both Rule 29.2 of the Rules of the Board of Regents (A1430-1432) and the practice guidelines (A1434-1455), which define patient abandonment and employer abandonment. These clearly state that if a Nurse "*abandoned a patient without making reasonable arrangements for the patient's continued care,*" this may constitute "patient abandonment." (A1430) There was no evidence of any gap in the patient's continued care. All of the nurses handed over their patients to qualified nurses who took over at the end of the nurses- shifts. There was therefore no legal or factual basis for a charge of patient abandonment.

In fact, Lato's charge to the jury in this case was improper in almost every respect.  Lato admitted that, rather than researching the law for appropriate instructions to the jury, he found the proper law "in his head," and determined his ad-libbed formulations of law to be sovereign to the law of the State of New York (A1374, 1382, 1392, 1394).

Unsurprisingly, given the biased and fraudulent presentation, the improper charge on the law, and the withholding of essential exculpatory evidence, the grand jury endorsed the indictment drafted by Lato and reviewed by Spota.  An analysis of the indictment (A1400-1411) shows that it is improper and unsupported by either legally competent evidence or the applicable law.  In addition, as the New York Appellate Division, Second Department unequivocally concluded, the indictment was obtained in violation of the Constitutional rights of the Nurses and of their attorney.

Paragraph 1 of the indictment asserted that the nurses contracted with "Sentosa Care."  The evidence to the grand jury, including a copy of one contract, was to the contrary.  This allegation discounted a serious concern of the nurses regarding the fact that they were employed neither by their petitioning employer nor by the facility at which they worked, but by an independent agency.  This was significant due to later language in the indictment.

Paragraph 8 of the indictment recites a nurse's duty to his or her patient, specifically stating that a nurse committed professional misconduct when the nurse "abandoned a patient without making reasonable arrangements for the patient's continued care…." The evidence unequivocally showed that no nurse committed abandonment of a patient within the meaning of the cited regulation by walking off during a shift, a fact that Lato took great pains to obfuscate and conceal from the Grand Jurors.

Paragraph 7 states that five of the nurses "were the only Avalon Gardens' nurses, other than a nurse who was on vacation who worked almost exclusively with children on ventilators." As Lato knew, this too was false, because there were two other nurses on the vent schedule, neither of whom was on vacation. Additionally, Susan O'Connor testified that the five non-vent pediatric nurses, who were not involved with the resignations, also covered the vent unit.

Regarding paragraph 9 of the indictment, there was simply no evidence that Mr. Vinluan had advised the nurses to resign "on or about April 5" or at any other time. Furthermore, and contrary to paragraph 12, there was no evidence that the resignations at Brookhaven, Split Rock and Bayview (other Sentosa facilities) "depleted' the "pool of possible temporary replacement nurses." There was no evidence regarding the number of nurses at Avalon, or at any of the other Sentosa facilities, which included many more than those identified in the indictment. There

was no evidence that nurses were unavailable from elsewhere, including agencies, as the Sentosa witnesses knew. The paragraph constitutes an example of the half-truths and whole lies that were peddled to the grand jury in this presentation.

The entire charge of conspiracy was unsupported by evidence and contained allegations unsupported by the record. There was no proof that anyone sought to obtain better-paying jobs for the nurses (A1404); indeed, there was no mention of pay whatsoever, except for the false claims by Philipson and O'Connor that the nurses' pay had not been reduced after the hike in the prevailing wage. Paragraph 15 implies that Sentosa had not breached the contract, and that the nurses were not, therefore, free to resign.

In addition, the "overt acts" set forth in ¶17 (a) and (b) were not only lawful acts but were constitutionally privileged. Lato never explained to the grand jury that the nurses and their attorney had an absolute constitutional right to file their OCAHO case, and that this could not be the subject of criminal charges. This is unsurprising because, as will be more fully set forth hereinafter, the indictment was judicially determined to be in violation of the First and Thirteenth Amendment rights of the Appellants, a fact that should have been obvious to the District Attorney of Suffolk County and his staff.

Although Mr. Spota disclaimed any detailed knowledge of the investigation or the indictment (A1349-1350, 1351-1352), the evidence showed conclusively

that Lato kept Spota informed of the facts of the case, including the grand jury presentation and the indictment, in both formal and informal meetings. Additionally, Lato provided Spota with a copy of the indictment in draft form, which Spota personally edited. This was unusual conduct for Spota (A1364, 1365, 1368-1369, 1373, 1376, 1379-1380, 1386-1387). When the indictment was filed, the District Attorney's office sent Appellants a letter directing them to surrender, lest a warrant for their arrest be "activated" (Exhibit A1413).

On April 7, 2007, the Appellants arrived at the Suffolk County Courthouse, where they were arrested. They promptly obtained counsel, who filed motions to dismiss upon the grounds, *inter alia*, that the prosecution violated the First and Thirteenth Amendments to the United States Constitution. The motions also alleged that the evidence before the Grand Jury was insufficient. Those motions were denied by Judge Doyle of the Suffolk County Supreme Court (A1415-1420).

The Appellants applied to the Appellate Division, Second Department for a Writ of Prohibition pursuant to New York CPLR Article 78. On January 13, 2009, the Second Department issued a writ of prohibition enjoining further prosecution of the Appellants upon the ground that the indictment violated their constitutional rights. In a scathing decision, the court stated that while the indictment was procured allegedly because the Appellants endangered the welfare of disabled patients, the "greatest risk created by the resignation of these nurses

was to the financial health of Sentosa." The Appellees did not appeal the dismissal.

On or about January 6, 2010, Appellants filed a complaint against the Appellees alleging causes of action under 42 U.S.C. 1983; State false arrest; and State malicious prosecution. Appellees moved to dismiss the complaint contending that they were absolutely immune from civil liability. On March 31, 2011, the trial court granted Appellees' motion in part, finding that Appellees were absolutely immune for acts arising out of their role as advocates in presentation of evidence to the grand jury and after the indictment, but denied the motion in part, finding that they would only be qualifiedly immune for any violation of Appellants' civil rights occurring during the investigative phase of Appellees' roles.

Discovery ensued and Appellees then moved for summary judgment. The court, in a decision dated November 28, 2018, granted Appellees' motion finding that they were qualifiedly immune from civil liability during the investigative phase but that there was no evidence that Appellees violated Appellants' civil rights during the investigation. Appellants now appeal from the March 31, 2011 order and the November 28, 2018 order.

**POINT I**
**THIS CASE WARRANTS MAKING**
**A RARE EXCEPTION TO THE**
**DOCTRINE OF ABSOLUTE IMMUNITY**
**AS THE INVESTIGATION, GRAND JURY PRESENTATION**
**ARREST AND PROSECUTION OF THE APPELLANTS**
**WERE UNCONSTITUTIONAL *AB INITIO***

At the start, Appellants recognize that "[t]he doctrine of absolute prosecutorial immunity creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney." *Sheff v. City of New York*, 2004 WL 594894 (SDNY 2004). Many legal scholars have called for an end to absolute immunity including Judge Frederic Block, (who handled this case after the Motion for Summary Judgment was decided) stating that the cloak of absolute immunity should be lifted, either judicially or legislatively, and that prosecutors should be held accountable for their egregious behavior. *Frederic Block, "Let's Put an End to Prosecutorial Immunity"* The Marshall Project, March 13, 2018 available at https://www.themarshallproject.org/2018/03/13/let-s-put-an-end-to-prosecutorial-immunity; *see also Mark Niles, A New Balance of Evils: Prosecutorial Misconduct, Iqbal, and the End of Absolute Immunity*, vol 13 Stanford Journal of Civil Rights and Civil Liberties 137 (2017)(arguing that qualified immunity sufficiently protects prosecutors and that absolute immunity is harsh, unjust and should be eliminated); *Evan Bernick, It's Time to End Prosecutorial Immunity*, Huffington Post, August 12, 2015, available at

https://www.huffpost.com/entry/its-time-to-end-prosecuto_b_7979276 (policy considerations in favor of absolute immunity do not outweigh harm done by immunity); *Bidish Sarma*, *After 40 Years Is It Time to Reconsider Absolute Immunity for Prosecutors*, American Constitution Society, July 19, 2016 available at https://www.acslaw.org/expertforum/after-40-years-is-it-time-to-reconsider-absolute-immunity-for-prosecutors/ (absolute immunity has led to little more than "moral hazard" and "prosecutorial impunity").

Although 42 U.S.C. § 1983 does not on its face preserve traditional common-law immunities, "Congress did not intend § 1983 to abrogate immunities well-grounded in history and reason." *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993) (internal quotation marks omitted). These traditional common-law immunities normally include a prosecutor's absolute immunity from claims for damages arising out of prosecutorial duties that are "intimately associated with the judicial phase of the criminal process" including Grand Jury presentations. *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976).

Courts have long recognized though that absolute immunity may "leave the genuinely wronged ... without civil redress against a prosecutor whose malicious or dishonest action" has deprived them of their constitutional rights. *Imbler,* at page 427. There is an exception to absolute immunity when a judicial, or quasi-judicial,

official acts without jurisdiction. *Stump v. Sparkman*, 435 U.S. 349 (1975); *Ford v. Kenosha County*, 160 Wis.2d 485 (Sup.Ct. Wisconsin 1991).

In *Fields v. Wharrie,* 740 F.3d 1107, 1113-1114 (7th Cir. 2014), a case that has some of the egregious elements of this case, the Court declined to provide absolute immunity to a prosecutor who had fabricated evidence before the arrest of the defendant, and then presented that evidence at the defendant's subsequent trial. The prosecutor based his claim for immunity upon the fact that the prosecutor was acting in his prosecutorial capacity when he had presented the evidence. The Court stated:

> Wharrie is asking us to bless a breathtaking injustice. Prosecutor, acting pre-prosecution as an investigator, fabricates evidence and introduces the fabricated evidence at trial. The innocent victim of the fabrication is prosecuted and convicted and sent to prison for 17 years. On Wharrie's interpretation of our decision in *Buckley,* the prosecutor is insulated from liability because his fabrication did not cause the defendant's conviction, and by the time that same prosecutor got around to violating the defendant's right he was absolutely immunized. So: grave misconduct by the government's lawyer at a time where he was not shielded by absolute immunity; no remedy whatsoever for the hapless victim. In *Buckley,* in contrast, two victims—the coerced witnesses—had a damages remedy, and the fact that there thus were potential plaintiffs could be expected to have some deterrent effect against future misconduct. To extend *Buckley* to overrule *Whitlock* would leave a victim of graver misconduct (because coercion does not always result in fabrication of evidence—even torture must often elicit truthful confessions) completely unprotected. That's not only an offensive and indeed senseless result, but it doesn't jibe with the Supreme Court's decision in *Buckley,* where we read that "the [fact that] prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the

prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; *every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." Buckley v. Fitzsimmons, supra,* 509 U.S. at 275–76, 113 S.Ct. 2606 (emphasis added, footnote omitted); see also *Zahrey v. Coffey,* 221 F.3d 342, 349, 354 (2d Cir.2000); *McGhee v. Pottawattamie County,* 547 F.3d 922, 932–33 (8th Cir.2008); *Moore v. Valder,* 65 F.3d 189, 194–95 (D.C.Cir.1995). A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity. That would create a "license to lawless conduct," which the Supreme Court has said that qualified immunity is not to do. *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Wharrie's interpretation of our decision in *Buckley* would place that decision in conflict with the Supreme Court's *Buckley* decision, by giving absolute immunity to prosecutor-investigators who having fabricated evidence make sure that the evidence is used to convict the innocent victim of the fabrication.

In *Fields,* the prosecutor was accused of fabricating evidence during the investigatory phase of the case which was later introduced at trial. The court acknowledged that "false testimony" is the same as "fabricated testimony" offering the following definitions:

Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it. Much testimony is inaccurate, but not deliberately so and therefore not false or fabricated as we are using these words.
 *Fields*, *supra* 740 F.3d at 1110.

That is the same allegation made in this case – that Lato learned of and procured false testimony during his investigation and allowed that false testimony to be presented to the Grand Jury.

The Appellants ask this Court to  adopt the holding in *Fields v. Wharrie, supra* and carve out a further extension to apply to cases where a prosecution is unconstitutional *ab initio* and where its unconstitutionality was evident or should have been evident to the prosecutor from the facts and the law and where the prosecution is based upon evidence deliberately fabricated by the prosecutors. Such was the situation in the case herein, and the injustice is multiplied by the fact that the case was commenced and maintained by a corrupt prosecutor for a corrupt purpose.

The State Education Department and the State Health Department found that the Nurses had not violated any legal or ethical standards of the State of New York; the Suffolk County Police Department declined to bring charges against, or even investigate Appellants. The State Education Department is the agency specifically given jurisdiction over the conduct of nurses.  After a thorough investigation of Sentosa's complaint against the Nurses, the State Education Department found no evidence of patient or employer abandonment; it also found that the nurses did not engage in unethical conduct.

Then nearly one year after their resignations, the Appellant nurses and their lawyer found themselves indicted by a Suffolk County Grand Jury. An examination of the Grand Jury presentation shows clearly why a Grand Jury would choose to indict Appellants even though they engaged in legal and constitutionally-protected conduct. The prosecutor assigned to the case, Leonard Lato, ignored and hid from the grand jurors the exculpatory evidence of the State Education Department's decision; allowed almost every witness who testified about the nurses' recruitment and employment to present knowingly and demonstrably false evidence; misled or lied to grand jurors who asked relevant questions whose honest answers would have revealed the legality of the Appellants' conduct; and manufactured out of his own mind, the law that he charged the grand jury to consider in voting a potential indictment.

From the moment that District Attorney Spota and Leonard Lato met with Sentosa attorney Howard Fensterman, it was patently evident or readily discernible that no crime was committed. At that meeting, they were told that no shift went uncovered; they knew no patient had suffered any harm or even any risk of harm; and they knew that all Appellant Felix Vinluan did was provide appropriate legal advice. Prior to their arrest, Lato had met with many of the Nurses and had been told of the various issues at Sentosa that are set forth in the Statement of Facts. He was provided with a copy of the decision of the Department of Education

34

exonerating the nurses, and with a copy of the decision of the Nassau County Supreme Court denying the application by Sentosa for an injunction against Mr. Vinluan and the Nurses, based in major part upon the Court's finding that Sentosa had no likelihood of success in the civil action against Appellants (A937-944). At no point in the "investigation" was there a shred of evidence of criminality; indeed, there was no evidence of even a civil breach of contract by the Nurses, as none of them was working at their contracting facility. Instead, they were agency nurses, working at facilities not named in their contracts and paid by the agency that employed them.

Lato, however, continued the investigation and the prosecution of Appellants despite a complete lack of probable cause and despite significant evidence that Appellants had acted in a manner that was consistent with their obligations as Nurses and as an Attorney.

The only way Lato could secure an indictment on these misdemeanor charges was to make a wholly skewed, contorted and contrived grand jury presentation with facts and law he manufactured out of whole cloth. Lato commenced the presentation by telling the Grand Jurors that this was a case about nurses "abandoning patients" (A379-381). The Grand Jurors immediately inquired about the contract dispute. One stated: "I need to know both sides because there is only so much somebody can eat, you know" (A383). However, Mr. Lato utterly

failed to ensure that "both sides" were fairly presented, or that inconvenient questions by Grand Jurors, which might have revealed the paucity of facts in the case, or cast the case in the correct light, were ever answered. For example, he put only one nurses' contract into evidence and had Sentosa attorney Sarah Lichtenstein falsely testify that all the nurses' contracts were materially the same. He either suborned the perjury of Bent Philipson, Nancy Fitzgerald and Susan O'Connor about the nurses' employment conditions, knowingly presented perjured testimony or recklessly failed to investigate or verify its veracity. Indeed, since the Nurses complained to him about the working conditions, he had reason to know that the evidence he was presenting was false.

Sentosa recruiter Francris Luyun's testimony was false from beginning to end, with Lato vouching for and encouraging the falsehoods. Luyun was allowed to include blatant hearsay in his testimony, much of which appears to have had no basis in reality. The purpose of Luyun's testimony was clear: it provided the only evidence of any kind (albeit false and inadmissible) that linked Mr. Vinluan in any way to the charged scheme. Luyun lied about Vinluan being a competitor of Sentosa in recruitment and he lied about Vinluan trying to get nurses to work for other employers. He falsely testified that Vinluan advertised as a recruiter in the Philippines yet the ad that Lato introduced into evidence with the Grand Jury

showed that Vinluan only advertised for immigration law services and not recruitment.

Lato also ignored salient questions from Grand Jurors, who were clearly interested in learning whether the nurses had legitimate grievances that led to their refusal to continue working at Avalon. After Philipson's testimony, the suspicion of the Grand Jurors was apparently aroused, and the following exchange took place between Lato and a very intuitive Grand Juror, whose question identified exactly what was happening: that the Office of the District Attorney of Suffolk County was being used as leverage against innocent employees:

> GRAND JUROR: Does he [Philipson] plan on going back to the Philippines and doing any more recruiting?

> MR. LATO: Why would that ….

> GRAND JUROR: Because if he's using the District Attorney as a bargaining chip.

***

> I'm just saying now, during contracts, if he's going to say, listen, if you fail to show up there could be criminal charges against you.

> MR. LATO: I can't ask him that question because it's not pertinent. I understand what you are saying. That's the type of thing that there is some type of arrangement between the District Attorneys' office and him. I'll

have to have Tom Spota testify which is not going to happen, you know. (A484-485).

As bad as Lato's behavior was regarding the facts and the jurors' questions, his treatment of the law was even worse. When asked if the defendants would all be charged "exactly the same," Mr. Lato stated as follows:

> … there is a statute basically called acting in concert.   And you have the same federal law as well called aiding and abetting.  But essentially if three people are responsible for one person acting in a certain way, all there are liable as if they had done it themselves.  So, in other words, by way of example, say a person by the name of Joe, I want Joe to go rob a liquor store.  And my assistant also wants Joe to rob the liquor store, all three of us are liable even though Joe is the only one who physically did the robbery…. For instance, if we are all doing this together, we are in a group, everyone is responsible for what the other person does.  *And the theory of, again, if we are all in it together, conspiracy, each person is liable for the acts of his co-conspirator or agent.* (A571-572). (Emphasis added).

This, of course, is not the law of New York, because, unlike the Federal system, New York does not hold co-conspirators criminally liable for acts in furtherance of a conspiracy.  *See e.g. U.S. v. Salameh*, 152 F.3d 88 (2d Cir. 1998); *People v. Lanni,* 95 Misc.2d 4 (Sup.Ct. Bx.Cty.1978).

Lato also gave a charge on "conscious avoidance" (A580-581).  This led to the following exchange with a Grand Juror:

> GRAND JUROR:  In regard to blind willfulness, if they inquired that, let's say the abandonment – can I talk about the case?

> MR. LATO:  Yes.

GRAND JUROR: And they inquired to their legal representation, Mr. Vinluan, now is that blind willfulness anymore because they inquired and maybe said no it's not abandonment? I mean at what point these people are ignorant on the law, I'm going to assume so, they are asking a lawyer and he guides them the wrong way. Now, they have taken the time out to ask him, is that abandonment, and he says no. Where is their obligation at that point?

MR. LATO: That's for you to decide. True, this could be something for a person who is unsure of abandonment, and they ask another person whether in fact it is abandonment. Now, one thing that could be different in this case is, for instance, if Mr. Vinluan is involved in the case and has a vested interest, that is something for you to consider. On the other hand you are right, because sometimes people are unsure what they are doing is criminal. And they ask advice and you may in fact determine in this case that the nurses were worried about abandonment and they asked somebody and were told and actually believed that it would not be abandonment and yes there has been some evidence here that in fact the nurses said they inquired of Mr. Vinluan and whether he gave them and honest opinion that's for you to decide. *But also there is other evidence in this case that where the nurses actually walked out, the director of the facility said you can't, I have all these sick children.*

So, in other words, you have to determine whether, you know, in this particular case what they actually believed to be the case. That's all. I can't help you. It's a question of fact. You are right sir, it's something for you to consider. (A742-743).

He also acknowledged that he simply made up the charge to the jury on the

nurses' obligation to the patients which forms the basis of the counts of the

indictment charging endangering the welfare of a child or disabled person. Lato

read the definition of aiding and abetting from New York Penal Law §20.00, but

then gave another erroneous charge that co-conspirators are liable for each other's

crimes (A739-740). Lato had available to him both Rule 29.2 of the Rules of the

Board of Regents (A1430-1432) and the practice guidelines (A1434-1455), which

define patient abandonment and employer abandonment. These clearly state that if

a Nurse "*abandoned a patient without making reasonable arrangements for the*

*patient's continued care,"* this may constitute "patient abandonment." (A1430)

There was no evidence of any gap in the patient's continued care; to the contrary,

the only Nurse on shift at the time of the resignations completed her shift and

remained after her shift until she was able to hand over her patients to qualified

nurses. Each of the other Nurses had previously handed over their patients to

others, which ended to their obligation to the patients. There was therefore no

legal or factual basis for a charge of patient abandonment, as the Department of

Education, the entity charged with enforcing the Regulations under which the

Nurses were indicted, had previously found.

In fact, Lato's charge to the jury in this case was improper in almost every

respect. Lato admitted that, rather than researching the law for appropriate

instructions to the jury, he found the proper law "in his head," and determined his

ad-libbed formulations of law to be sovereign to the law of the State of New York

(A1374, 1375, 1382, 1392, 1394).

Manufacturing the law to meet the facts violates a central principle of law:

the doctrine of lenity. At its core, the doctrine requires that people cannot be

charged with crimes absent an applicable statute and that statute must then be strictly construed in favor of the putative defendant. *See*, *U.S. v. Campos-Serrano,* 404 U.S. 293 (1971)( one is not to be subjected to a penalty unless the words of the statute plainly impose it); *U.S. v. Wiltberger*, 18 U.S. 76 (1820)(penal statutes must be strictly construed).

Appellants have not been able to find another prior case where the prosecutor literally made up the law that was charged to the Grand Jury.

Unsurprisingly, given the biased and fraudulent presentation, the improper charge on the law, and the withholding of essential exculpatory evidence, the grand jury endorsed the indictment drafted by Lato and reviewed by Spota. An analysis of the indictment (A1400-1411) shows that it is improper and unsupported by either legally competent evidence or the applicable law. In addition, as the New York Appellate Division, Second Department unequivocally concluded, the indictment was obtained in violation of the Constitutional rights of the Nurses and of their attorney.

As has been set forth in the facts, the indictment consists of allegations not supported by the evidence, falsehoods and *non sequiturs.* It misstates the law and charges a conspiracy which consists, in its entirety, of legal actions in support of a legal objective. Even with the falsified testimony and the refusal to submit relevant and conclusive exculpatory evidence, a reading of the Grand Jury minutes

demonstrates conclusively that there was no crime committed by either the Nurses or Mr. Vinluan.

On January 13, 2009, the Second Department issued a Writ of Prohibition enjoining further prosecution of the Appellants upon the ground that the indictment violated their constitutional rights. It held that to prosecute this case would be to violate the Thirteenth Amendment's prohibition against involuntary servitude and the First Amendment's protections of freedom of speech and assembly. In a scathing decision, the court stated that while the indictment was procured allegedly because the Appellants endangered the welfare of disabled patients, the "greatest risk created by the resignation of these nurses was to the financial health of Sentosa." Indeed, that conclusion should have been self-evident to anyone upon the reading of the indictment.

This case presents a set of facts not seen by any Court before. An investigation and prosecution constitutionally infirm from the outset that was used to meet the ends of a politically powerful entity and its politically powerful attorney and principals. It was evident from the start that there were no facts supporting any criminal charge; that the Appellants had been investigated and vindicated by governing authorities with jurisdiction over the acts with which they were charged; and that no patient was put at risk by the conduct of the Nurses. The only way Appellees were able to obtain an indictment was to present a false and

skewed version of the facts and to make up the charge on the law to the Grand Jury.

The extension of the law that the Appellants herein propose is not a drastic change that will "open the floodgates" to baseless and harassing actions against Prosecutors feared by the Supreme Court in *Imbler v. Pachtman, supra* at 424-428. Rather, this extension would correct the injustice of allowing a prosecutor intentionally to prosecute individuals in clearly unconstitutional indictments based upon fabricated evidence. Surely, situations such as the one described herein, to which the Appellees have been subjected, will be rare. They should be accorded the right to prove the extent of the misconduct, and the extent of the damages, to a jury, rather than having their case dismissed.

Appellants ask this court to hold that Appellees – under these very unusual and unique facts – should not enjoy the protection of absolute immunity.

## POINT II

## AS THE EVIDENCE SHOWS THAT APPELLEE SPOTA HAD DIRECT PERSONAL INVOLVEMENT IN THIS MATTER THE COUNTY AND SPOTA WERE NOT ENTITLED TO SUMMARY JUDGMENT

The County Appellees were granted summary judgment dismissing the Appellant's action upon the ground that the County cannot legally be liable for the improper acts of Assistant District Attorney Leonard Lato ("Lato") and District Attorney Thomas Spota ("Spota"). However, because Lato's actions herein were taken pursuant to official policy established by the Chief Law Enforcement Officer of Suffolk County, and because the evidence shows that Mr. Spota personally participated in the unconstitutional actions, the County is liable for those acts. In dismissing this ground of liability, the trial court stated that no Constitutional rights of the Appellants were violated, and that no actions of the District Attorney in failing to supervise his staff were proven. *Anilao v. Spota, supra* at 251, fn. 36. This conclusion was erroneous in light of the substantial evidence against the Suffolk County Appellees.

It is well established that 42 U.S.C. §1983 does not impose liability for a municipality solely under the doctrine of respondeat superior. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–691 (1978). However, when a municipal

employee acts in violation of an individual's Federal civil rights pursuant to municipal policy or custom, a different issue is presented. The question is not whether the employee acted improperly, but whether the municipality acted improperly. *Walker v. City of New York,* 974 F.2d 293, 296 (1992) *cert. denied* 507 U.S. 961. Under those circumstances, the municipality may be exposed to §1983 liability (*see, Monell, id.*). The plaintiffs must show the existence of a constitutionally offensive policy or custom and its causal connection to the injury. *Board of the County Commissioners of Bryan County v. Brown,* 520 U.S. 397 (1997). When the challenged action is by an official acting under the guise of official policy, the question is whether that official had authority to, and did, exercise final policy-making in that area. The District Attorney of Suffolk County is clearly a policy-making official. Courts recognize that a New York District Attorney's role in the prosecution of criminal cases is unique (*see, Baez v. Hennessy,* 853 F.2d 73, 76 (2d Cir. 1988) *cert. denied* 488 U.S. 1014). If the action is undertaken by the official with final policy-making authority, the municipality will be liable even if the action is not taken pursuant to an official policy. *Mandell v. County of Suffolk,* 316 F.3d 268, 385 (2d Cir. 2003).

The trial court found that Mr. Spota was a State, not a County, official, and that he was acting in that capacity in the prosecution of the Appellants, thereby insulating his actions from personal liability or from rendering Suffolk County

liable, under the rubric of absolute immunity (See, Point I, supra). However, for the purposes of *Monell* liability, Mr. Spota's actions bind, and inure to the detriment of, the County. When a District Attorney, for example, evinces a pattern of ignoring improprieties and misconduct by law enforcement agents (*Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir. 1991)), or fails to properly train and supervise ADAs regarding *Brady* and other legal obligations (*Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), *cert. denied* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762)), such management failures correlate with defects in the District Attorney's role as a local policymaker. *Walker, supra*. A District Attorney historically has been categorized as a local, rather than a State, officer (*see,* Public Officers Law § 2), which is unremarkable in that the District Attorney is elected and compensated by the county's voters and enjoys no extra-county jurisdiction (*Fisher v. State,* 10 N.Y.2d 60 (1961)). As a result, a District Attorney's torts are the torts of the county rather than of the State. *Id.; Claude H. v. County of Oneida,* 214 A.D.2d 964 (4th Dept. 1995). Thus, following this Court's precedents, where prosecutors, pursuant to policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a conviction, liability rests with the county, (*Walker v. City of New York*, 94 F.2d 293, 301 (2d Cir. 1992) *cert. denied* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762), rather than with the State (*Gentile, supra; Walker,*

*supra; Myers, supra*) and may be asserted under § 1983. *Babi–Ali v. City of New York,* 979 F.Supp. 268 (S.D.N.Y. 1997). For example, in *Bailey v. City of New York,* 70 F.Supp.3d 424, 453-454 (E.D.N.Y. 2015), the Court held that the City of New York could be liable for unconstitutional polices or actions by the Kings County District Attorney's office, although it had no control over what occurred in that office. In *Walker v. City of New York, supra* at 300, the Court found that the municipality would be liable for failure of the District Attorney to properly train Assistant District Attorneys regarding their obligation to disclose exculpatory evidence.

Spota's aggressive personal involvement in this case leads inescapably to the conclusion that *Monell* liability should be imposed on the County for the deliberate indifference of his office to the constitutional rights of the Appellants. In fact, the evidence demonstrates that Mr. Spota's fingerprints were all over this prosecution. The only evidence that this was a normal prosecution was Spota's self-serving assertion that he had no personal involvement in the case. This is refuted by substantial objective evidence. It was Spota who started the ball rolling in this prosecution. Spota met personally with the Sentosa principals and their lawyers; went to lunch with Sentosa's politically connected lawyer Howard Fensterman, along with Leonard Lato, Spota's hand-picked assistant, where they discussed the necessity for Mr. Vinluan to be prosecuted. Spota then assigned Lato to conduct

the investigation and undertake prosecution of the Appellants. Lato testified that Spota edited the indictment and was always kept informed of the progress of the case; also, it was clear to Lato that the matter was important to the District Attorney. In response to all this evidence Spota merely asserted, and the trial court found that "plaintiffs have no evidence" of any personal involvement of his. To the contrary, there was, at the very least, an issue of fact regarding Spota's personal involvement.

In this case, as in almost no other case that Appellants have been able to find, *the* policymaker in the District Attorney's office was behind the wheel of the prosecution, and completely controlled it. Where, as here, the contention is not only that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but also that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. *See, e.g., Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–25, 108 S.Ct. 915 (1988). It cannot fairly be disputed that Spota had final authority regarding whom to investigate and prosecute criminally in Suffolk County.

In addition to the fact that the chief law enforcement officer of Suffolk County was personally involved in the unconstitutional actions taken herein, the Appellants have also shown that the actions were taken pursuant to an unfortunate policy of the District Attorney of Suffolk County. It was the policy of the Office, established by Mr. Spota himself, to elevate the political aspects of any given prosecution over the responsibility of a law enforcement officer to enforce the law without favor. As recent events confirm, the Office undertook numerous actions to prosecute, or refrain from prosecuting, individuals based upon their power and/or their contacts. In *Bailey v. City of New York,* 2015 W.L. 4523196 (E.D.N.Y. July 27, 2015), the Court held that the actions of the office of the Kings County District Attorney in other similar cases would be relevant to establishing a pattern of unconstitutional activity in order to impose *Monell* liability.

The trial court declined to take judicial notice of the numerous allegations and investigations surrounding Spota's misuse of his public office for political gain or motivation:

First, federal investigators, including the United States Attorney's office, indicted and convicted Spota and one of his chief assistants, who took part in the cover-up of the assault on a man who stole a duffel bag from the Police Officer's automobile. The Officer was a longtime Spota protégé who was convicted of violating the civil rights of the thief. The allegations included a charge that Spota

and one of his deputies were personally involved in covering up of allegations against and thwarting the investigation of the officer, who, without question, was guilty both of assaulting the person who had stolen his duffel bag and covering up the incident (A1457-1460). There were also allegations that, throughout most of 2007, the Suffolk County District Attorney's Government Corruption Bureau eavesdropped on a politically connected attorney's wiretapped phone. It is alleged that the top three officials in the Suffolk District Attorney's office managed the operation and that Spota personally signed the affidavit requesting authority to eavesdrop. Yet, inexplicably, no indictments followed this investigation and the narcotics conviction of the attorney was quietly vacated (A1462-1483). It is further alleged that, in 2012, Mr. Spota interfered with and stonewalled an investigation of the Suffolk County Chairman of the Conservative Party. The United States Attorney detailed these corrupt efforts in a motion in the case of the Chairman of the Conservative Party. As a result, Suffolk County officials joined in the call for Spota's resignation (A1485-1486, 1488-1545).

Contrary to the finding of the trial court, these allegations, subsequently bolstered by the convictions of Mr. Spota and one of his assistants, are more than "mere speculation." To the contrary, there was a clear pattern of behavior prior to, during, and after, these events that demonstrate the existence of pervasive corruption in the Office of the District Attorney of Suffolk County. This pattern of

corruption led, in part, to the prosecution of the Appellants under an unconstitutional indictment.

Although Mr. Spota had not yet been convicted at the time of the Order appealed from, this Court can take judicial notice of the subsequent conviction. Fed. R. Evidence 201(b)(2), (d); *Coggins v. County of Nassau,* 2008 WL 2522501, at *7 (E.D.N.Y. June 20, 2008). Based upon the facts presented to the trial court, coupled with the later conviction, it is clear that Spota opened up his office to a politically powerful lawyer for reasons other than serving justice, or protecting the citizens of Suffolk County. The evidence here shows that Philipson and his attorney, Fensterman, wielded sufficient clout to recruit a United States Senator to pressure the Republic of the Philippines to act on their behalf. Indeed, Fensterman boasted of his political influence on his website. That piece of his biography was removed only when the political influence was exposed by Newsday, which extensively reported in connection with this case (A1324, 1331-1332). It should be noted that Fensterman obtained a meeting with Spota without even revealing the subject matter, and with a single telephone call.

In order to assist the Sentosa defendants, Spota assigned one of his top Bureau Chiefs to handle what was at most a simple misdemeanor matter. From the beginning, Spota personally oversaw this investigation. He not only introduced Lato and the investigators to Fensterman, but he also showed unusual interest in

this case, even editing the draft indictment (A1364, 1365, 1368-1369, 1373, 1376, 1379, 1386-1387). This conduct fits the pattern of the above-described allegations. At least at the summary judgment stage, the Appellants have established *Monell* liability.

In evaluating Mr. Spota's conduct in this case, the Court should also note the fact that he assigned Lato to this investigation. Lato testified that he was even given the title of Chief of a newly-created Insurance Bureau because he refused to join the DA's Office unless he was a Bureau Chief. He testified that in fact he was brought in to work on "Special Projects (A1362)." The evidence in this case has shown that Lato was an extremely problematic Assistant District Attorney, whose penchant for "one man" crusading made him uniquely unsuitable to conduct a fair investigation. Mr. Spota and the other members of his office observed, during Lato's tenure as an Assistant District Attorney, that Lato was "virtually unsupervisable" (A1355-1356). He did not follow instructions and was rarely in the office because he spent much of his time in the United States Attorneys' office, from which his employment was previously terminated. Prosecutors in his bureau were significantly behind in their investigations because he was unavailable to supervise. They also observed that he made unsupported allegations of wrongdoing against others in the office (A1356). For example, Spota recounted that Lato falsely informed the United States Attorneys' Office that another

Assistant District Attorney had committed a Federal crime (A1355-1356). Lato's erratic behavior was on display in the two cases based upon his prosecutorial misconduct. In *Kanciper v. Lato,* 13-cv-871, Mr. Lato was sued, *inter alia,* for violating the policy of the District Attorney's Office against "DA Shopping," personally prosecuting a case after it had been rejected by another ADA, explaining that the individual who rejected the original warrant was "lazy and stupid" (A1339-1340, 1363). Lato went so far as to characterize the putative defendant as a "sociopath," a psychological diagnosis that he made while observing Mrs. Kanciper as he (Lato) drove by her home where she was sitting on a stoop (A1548-1549). When he became agitated by the questioning by counsel for the nurses in this case, Lato made extremely outrageous and profane remarks on the record.

However, faced with what he knew or should have known about Lato, Spota here failed to supervise Lato, and failed to protect individuals from his erratic and unlawful behavior. To the contrary, according to Lato, Spota reviewed and acquiesced in the conduct. Lato specifically testified that Spota reviewed and edited a draft of the indictment (A1364, 1365, 1368-1369, 1373, 1379, 1386-1387, 1400-1411). However, no objective or fair individual, reviewing this indictment, could rationally conclude that this prosecution was constitutionally permissible. Appellants ask the Court to carefully examine the indictment language Paragraphs

1 through 7 inclusive; 9 through 11 inclusive; paragraph 14; paragraph 15 and paragraph 17a. 17 b and 17c all set forth federally protected conduct as the basis for the conspiracy and the criminal charges. These paragraphs attack the nurses for acting collectively to resign and address their grievances in proper forums as essential factual elements of the crimes for which they are charged.

For example, paragraph 14 states:

It was the conspiracy's objective to obtain for the Avalon Garden nurses' alternative employment and a release from their three-year commitment to Sentosa Care without incurring a financial penalty of $25,000.00.

This is a Federally-protected, legal objective.

Paragraph 15 states:

In pursuit of their objective, the defendant Vinluan and the defendant nurses sought to establish that Sentosa Care had breached the contract and had discriminated against the nurses.

Paragraph 11 seeks to criminalize that the nurses acted collectively by stating:

Still later, on April 7, 2006, the defendant nurses, knowing that nurses at other Sentosa Care facilities had resigned also submitted resignation letters. The content of each letter was identical to the content of letters to the other Sentosa Care facilities and stated that the resignation was effective immediately.

Most importantly and most troubling are paragraphs 17a, 17 b and 17c, which purport to list the overt acts that comprise the alleged criminal conspiracy.

Not only do these paragraphs allege wholly legal conduct, but they allege Federally-protected collective action. Paragraph 17a states that Mr. Vinluan gave the nurses legal advice; 17b alleges Vinluan filed a claim with a Federal agency on the nurses' behalf; 17c alleges that the nurses resigned from their workplace. Again, an essential element of the indictment upon which Appellees rely is that Mr. Vinluan committed an overt act in furtherance of a criminal conspiracy by providing legal advice and that the nurses took legally protected collective action against their at-will employer. The indictment therefore charges the Appellants with a conspiracy whose objective was legal and whose overt acts were legal. Additionally, once the Appellate Division reviewed this indictment, they readily concluded that the District Attorney had exceeded his authority *ab initio* by prosecuting the Appellants herein for having engaged in constitutionally-protected actions.

Spota's actions, both in the political realm and in the supervision (or lack thereof) of Mr. Lato took place before, during, and after the events in this case, and demonstrate a pattern in his office of deliberate indifference to the constitutional rights of the Appellants. In evaluating whether there is a pattern of indifference, the Court may use both prior and subsequent actions by the office to evaluate the County's *Monell* liability. In *Collins v. City of New York,* 923 F.Supp.2d 462, 477-478 (E.D.N.Y. 2013), the Court held that persistent actions by the District

Attorney, including those occurring after the events in that case, together with failure to take remedial actions, are relevant and probative in establishing a municipal custom. The Court cited *Grandstaff v. City of Borger,* 767 F.2d 161, 170 (5th Cir. 1985) for the proposition that "the disposition of the policymaker may be inferred from his conduct after the events [giving rise to the constitutional violation]." *See also, Henry v. County of Shasta,* 132 F.3d 512, 5119 (9th Cir. 1997); *Bordanaro v. McLeod,* 871 F2d 1151, 1167 (1st Cir. 1989).

Finally, the Suffolk County Appellees conceded that even without a policy or custom, Spota and Suffolk County can be liable under the deliberate indifference standard. If the lack of oversight is so egregious as to constitute "deliberate indifference" to the rights of others, then the County and Spota may be held liable for Lato's actions. *See Monell v. City of New York*, *supra*. Here, Spota met this standard by allowing Lato to pursue this investigation, arrest and prosecution without a shred of evidence of any wrongdoing by any of the Appellant, in particular without any evidence whatsoever against Felix Vinluan.

The sum total of all the evidence adduced in the purported investigation of Lato and overseen by Spota was that: due to broken promises by their recruiter and employer, ten at-will nurses decided to resign <u>after</u> they completed their shifts, with some not assigned to additional shifts for as many as three day at the Nursing Home to which Prompt Agency, their employer assigned them; that all the Nurses'

subsequent shifts were promptly and adequately staffed; that no patients were injured or even jeopardized; that the State Education Department which regulates the Nurses' conduct found no evidence of unprofessional conduct, of employer abandonment, or of patient abandonment; and that the nurses sought and received proper legal advice from Mr. Vinluan.

That the District Attorney for Suffolk County and Leonard Lato decided that the perfectly legal conduct of all Appellants amounted to criminal conduct is astounding and shameful. The only way to secure such an indictment was to rely on unfounded hearsay, fraud and perjury, along with distorting the Education Department's regulations on employer-abandonment. This included the denial of Appellants' request to instruct the grand jury on the law of patient abandonment as it related to the Nurses and as determined by the Education Department itself in this very case, as well as the refusal to present the evidence that the Education Department had cleared the Nurses under the very regulations that formed the basis of the charges. Of necessity, the indictment then twisted the Education Department language to arrive at the absurd charge of patient abandonment.

Against this background, it is also clear that the Court erred in finding that the actions of the County Appellees did not violate the Appellants' constitutional rights. Because of the actions of Lato, who was closely supervised by Spota, the Appellants were prosecuted under an unconstitutional indictment that charged

them with "crimes" for having engaged in constitutionally protected conduct. More specifically, the Nurses were indicted for conduct that, according to the Department of Education, violated no ethical or legal obligation to the patients, did not endanger any patient, and was constitutionally privileged. Mr. Vinluan was indicted for the constitutionally-protected activity of properly advising and representing his clients, after a grand jury presentation that failed to contain one shred of admissible evidence against him. This disgrace of an indictment led to the arrest of the Appellants, and years of emotional and financial damage to them resulting from the indictment. This clear violation of their constitutional rights was undertaken intentionally by Spota and his hand-picked assistant, Lato, in order to weaponize the office for the benefit of the politically connected. It is no wonder that the Appellate Division found that the entire prosecution of Appellants was unconstitutional *ab initio* and was n maintained solely to benefit defendant Sentosa's business interests and not to address a public wrong.

This evidence, along with the evidence of Mr. Spota's corrupt abuse of the Office of the District Attorney, should have led the Court to deny the motion for summary judgment. This Court should reverse and allow a trial on the issue of *Monell* liability.

## POINT III

## THE APPELLEES ARE NOT
## ENTITLED TO QUALIFIED IMMUNITY

In granting the Appellees summary judgment upon the ground that they are

protected by qualified immunity for their investigative work, the trial court held

that the substantial investigative work by Lato at the personal direction of Spota, in

which evidence relating to the Appellants' criminal liability was fabricated and the

Appellants were deceived as to Lato's purpose, did not violate the Appellants'

constitutional rights. It characterized the substantial factual showing that the

Appellants made as "mere speculation," insufficient to overcome the showing by

Appellees that the Appellants' constitutional rights were not violated during the

investigative stage. *Anilao v. Spota, supra* at 250-251. To the contrary, the

Appellants presented sufficient factual evidence of improper conduct by the

Suffolk Defendants in the investigative stage of the proceedings to warrant the

denial of summary judgment.

A District Attorney, and the members of his office, act in many roles –

administrative, advocative, investigative and prosecutorial among them. *Hill v.

City of New York,* 45 F3d 653, 658 (2d Cir. 1995). Under most circumstances (but

not in this case – *See,* Point I, *supra)*, a Prosecutor acting solely as an advocate in

prosecuting a case is absolutely immune from liability. *Imbler v. Pachtman,* 424

U.S. 409, 410 (1976); *Shmueli v. City of New York,* 424 F3d 231, 236 (2d Cir.

2005); *Hill v. City of New York, supra* at 660-661. In contrast, when the District Attorney acts in an investigative or administrative manner, he is entitled to as much, or as little immunity as a police officer. *Hickey v. City of New York,* 2002 W.L. 1974058 (S.D.N.Y. August 26, 2002).

The determination of whether the function under which the prosecutor is operating is prosecutorial is based upon the nature of the function being performed, rather than upon the title of the individual performing it. *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993); *Hill v. City of New York, supra* at 660. Absolute immunity extends only as far as is necessary to protect the judicial process. *Hill v. City of New York, supra* at 661. When the prosecutor supervises or conducts the investigation of a crime, absolute immunity is lost. *Carbajal v. County of Nassau,* 271 F.Supp.2d 415, 421 (E.D.N.Y. 2003). The Courts have noted that it is often difficult to distinguish between investigative and prosecutorial functions. *Zahrey v. Coffey,* 221 F3d 341, 347 (2d Cir. 2000). Generally, conduct undertaken during the investigative phase, before probable cause to arrest has been established, does not confer absolute immunity upon the prosecutor. *Buckley v. Fitzsimmons, supra* at 273. Thus, in *Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir. 1998), the court distinguished between preparing the presentation of an existing case and attempting to furnish evidence upon which a prosecution could be based. Only the former is protected by absolute immunity.

In contrast, qualified immunity protects a public official from liability for conduct that does not violate a clearly-established right of which a reasonable person would be aware. *Zahrey v. Coffey,* at 347-348. An official is entitled to qualified immunity if his or her conduct did not violate clearly established statutory or constitutional rights regarding which a reasonable person would have knowledge, or if it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act. *Betances v. Fischer,* 837 F3d. 162, (2d Cir. 2016); *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir. 2001).

In *Zahrey v. Coffey, supra,* decided in 2000, this Circuit held that procuring the indictment of an individual based on fabricated evidence violated a right that was clearly known and established. The Court denied the prosecutor qualified immunity. Five years earlier, the Court arrived at the same result in *Hill v. City of New York, supra.* As recently as 2015, this Court reaffirmed this principal in *Morse v. Fusto,* 804 F.3d 548 (2d Cir. 2015). There is no question of qualified immunity in this case, given the manifest bad faith demonstrated by the County defendants.

In this case, as the trial court noted in *Anilao v. Spota,* 774 F. Supp.2d 457, 481-485 (E.D.N.Y. 2011), the County Defendants acted both as investigators and prosecutors. The District Attorney's office was obliged to act as the police had refused to act.

The Appellees, in trying to fit their investigative conduct into the requirements for absolute immunity claimed that the Appellants were "unable to prove" that the police declined to act. The evidence, from the mouths of the defendant's own witnesses, proves otherwise. At the behest of its counsel, Sentosa sent Susan O'Connor to the local police precinct to file a report, seeking to have the nurses arrested (A1243). The police took no action in response to the complaint. (A1345-1346) Mr. Fensterman told Newsday that the police "did not understand the gravity of this case." He later denied recollection of this interview but admitted that it was his belief that the Police Department did not understand the situation (A1348). Mr. Spota testified that the police had assigned the complaint to their crime control unit, which also took no action. (A1345-1348). Leonard Lato testified that Investigator Walter Warkenthien confirmed to him that the police department declined to investigate the matter (A1371). Thus, in order to do the bidding of the politically-powerful Sentosa organization, the District Attorney's Office was obligated to act both as investigators and prosecutors. The evidence is clear that the Police did not act, and that all of the investigative functions were undertaken by Lato and the two investigators from the Office of the District Attorney. Thus, any activity undertaken by them must be analyzed under the same standards that apply to investigation of conduct by the police.

The evidence showed that Mr. Lato's zeal to indict Mr. Vinluan and his clients led Lato to contrive evidence. Lato acknowledged the centrality of Mr. Vinluan to the prosecutorial goals of Sentosa. At a lunch meeting attended by Lato, Spota and Fensterman, the latter emphasized that Vinluan was a target. Although Lato claimed that he "did not listen" to Fensterman, he testified that he recalled that aspect of Fensterman's conduct at the luncheon (A1366, 1369-1370). Philipson made similar statements in other contexts (A1261-1262, 1282-1288). Lato testified that the catalyst for his making Mr. Vinluan a target was that Vinluan's account of driving to Washington D.C. to file the petitions with OCAHO did not ring true (A1387-1388, 1390-1391). This "explanation" was patently absurd. Moreover, Jennifer Lampa observed, that when Lato interviewed her, he was targeting Mr. Vinluan (A1037-1039).

In furtherance of his effort to cast Vinluan as a competitor of Sentosa, as both Fensterman and Philipson had alleged, Lato inquired in the Grand Jury of Sarah Lichtenstein, Esq., about Mr. Vinluan's activities in the Philippines. Lichtenstein had provided Lato with an advertisement that showed Vinluan had an immigration practice in the Philippines. The document did not show that he was a recruiter (A1554-1555). Using this ad, and the false testimony of Francris Luyun, Lato then proceeded to fabricate a case against Mr. Vinluan. During the grand jury presentation, Lato, when it suited his purpose, was scrupulous about not allowing

hearsay testimony to be presented to the grand jury (See, e.g., A433, 462, 557, 627).  In contrast, when he found it necessary, he allowed Luyun to include blatant hearsay in his testimony, much of which appears to have had no basis in reality. (A654-655, 657, 660-661).  When asked to explain why Luyun was permitted to testify to hearsay, Lato had no credible explanation (A1389-1395).  Lato reinforced Luyun's improper testimony with misleading statements to the grand jury.  When a grand juror asked Mr. Lato whether he knew "of any of the nurses that left and went to work for Vinluan's organization," Lato falsely replied: "Yes" (A658). Lato knew this to be untrue because his files contained subpoenas addressed to the nurses' employers, none of which included Vinluan, or any entity related to Vinluan (A1377-1378).  Thus, having fabricated evidence, Lato used it to persuade the grand jury to indict the especial target of the Sentosa organization.

In similar cases, the courts have held that prosecutors' conduct was not protected by absolute immunity.  In *Hill v. City of New York, supra,* the plaintiff alleged that the prosecutor, in investigating a case of child abuse, made two videotapes of the child-victim.  In the first, the victim implicated someone other than his mother.  The prosecutor allegedly then coached the child to accuse his mother, following which he created a second video tape.   He suppressed the exculpatory tape and used only the inculpatory tape to obtain an indictment.  The Court held that, while the prosecutor was immune for presenting the fabricated

evidence to the grand jury and withholding the favorable evidence, he was not immune for the pre-indictment fabrication of evidence. *Id.* at 662-663. This, in no way differs from Mr. Lato's conduct in preparing and ultimately presenting fabricated evidence to the grand jury.

In *Zahrey v. Coffey, supra,* the plaintiff similarly alleged that the prosecutor fabricated evidence to be used before the grand jury by pressuring, bribing or otherwise improperly inducing witnesses to testify falsely before the grand jury. The Court held that this conduct, undertaken during the investigative stage of the action, did not afford absolute immunity to the County defendants.

In *Smith v. Garretto, supra,* the district attorney was denied immunity for obtaining an expert to fabricate a report for use during a prosecution. *See also, Walker v. Clearfield County District Attorney,* 413 Fed. Appx. 481 (3d Cir. 2011).

Here, Lato's creation of evidence prior to the presentation of the case to the grand jury vitiates his entitlement, and that of the County defendants, to qualified immunity. Considering the fact that Lato well knew, from the time that he was assigned the investigation, that the Sentosa defendants insisted upon the prosecution of Mr. Vinluan, that he articulated a flimsy pretext for the focus on Mr. Vinluan, and that the only evidence of any kind against Mr. Vinluan was evidence that was intentionally fabricated by Lato, the reasoning of the cases cited above mandates that the Suffolk Defendants do not have absolute immunity. Moreover,

there can be no question that, at the time of this prosecution, the legal proposition that one may not fabricate evidence in order to secure a prosecution was a clearly established legal principle.  Thus, the Suffolk Defendants are similarly not entitled to qualified immunity.

It is beyond doubt that the plaintiffs were deprived of their liberty as the result of the manufacture of evidence.  As the Court noted in *Zahrey v. Coffey, supra,* this is not a case in which evidence was fabricated but not used.  Rather, this false evidence was presented to the grand jury, and constituted a substantial basis for the indictment.  It played a role in supporting the misguided conspiracy charge against the nurses and Vinluan.  It is true that the grand jury indicted the Appellants, but, here, that does not break the chain of causation between the manufacture of evidence and the indictment, even if the court finds that the defendants are absolutely immune.  *Zahrey v. Coffey, supra* at 352-353; *Thomas v. Sams,* 734 F.2d 185 (5th Cir. 1984).  As is more fully set forth in Point I, *supra,* the grand jury presentation was infused with misconduct, which was, in large measure, perpetrated by the same prosecutor who fabricated the evidence.  There can be no break in the chain of causation.

There was no point during the investigation and prosecution of the plaintiffs in this case that probable cause ever arose to arrest or indict any of them.  As is shown in Point I, the grand jury presentation was so rife with errors and

misconduct as to negate any finding that it broke the chain of causation. The lack of probable cause is manifest in the fact that the Appellate Division summarily dismissed the indictment on First and Thirteenth Amendment grounds. Again, the fact that a person cannot be indicted for quitting a job, or for giving legal advice, was so well established that the Second Department intervened to dismiss a pending prosecution. The fact that the State Court Judge initially refused to dismiss the indictment does not confer probable cause upon the defendant's conduct or grant them immunity. A reversed order does not confer justification. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996).

In short, the conduct of the County Defendants deprived them of both qualified and absolute immunity.

# CONCLUSION

The Judgment should be reversed as to Defendants Thomas Spota, Leonard Lato, Office of the District Attorney of Suffolk County, and County of Suffolk, and the case remanded for trial of the Causes of Action against them.

Dated: March 16, 2020

Yours, etc.,

\James O. Druker
JAMES O. DRUKER, ESQ.
PAULA SCHWARTZ FROME, ESQ.
KASE & DRUKER, ESQS.
Attorneys for Appellants
ELMER JACINTO, JULIET ANILAO
HARRIET AVILA, MARK DELA CRUZ,
CLAUDINE GAMIAO, JENNIFER LAMPA,
RIZZA MAULION, JAMES MILLENA, MA
THERESA RAMOS and RANIER SICHON
1325 Franklin Avenue, Suite 225
Garden City, New York 11530
(516) 746-4300

\Oscar Michelen
OSCAR MICHELEN, ESQ.
CUOMO, LLC
Attorneys for Appellant FELIX VINLUAN
200    Country Road, Suite 2 South
Mineola, New York
(516) 741-3222

# CERTIFICATE OF COMPLIANCE

The brief was prepared on a computer in 14 point Times New Roman typeface.  The brief is double-spaced except in sections of quotes from cases or facts which are single-spaced.  The word count of the processing system of the computer used to create the brief states that the brief's word count is 14,144 words.

Respectfully Submitted

\Oscar Michelen

Oscar Michelen
Attorney for Appellant VINLUAN
CUOMO LLC
200 Old Country Road
Suite 2 South
Mineola NY 11501
516-741-3222
omichelen@cuomollc.com