# 19-3949-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



JULIET ANILAO, HARRIET AVILA, MARK DELA-CRUZ,
CLAUDINE GAMAIO, ELMER JACINTO, JENNIFER LAMPE, RIZZA MAULION,
THERESA RAMOS, RANIER SICHON, JAMES MILLENA,

*Plaintiffs-Counter-Defendants-Appellants,*

*and*

FELIX Q. VINLUAN,

*Plaintiff-Appellant,*

*v.*

THOMAS J. SPOTA, III, INDIVIDUALLY AND AS DISTRICT ATTORNEY OF SUFFOLK COUNTY,
OFFICE OF THE DISTRICT ATTORNEY OF SUFFOLK COUNTY, LEONARD LATO, INDIVIDUALLY
AND AS AN ASSISTANT DISTRICT ATTORNEY OF SUFFOLK COUNTY, COUNTY OF SUFFOLK,
SUSAN O'CONNOR, NANCY FITZGERALD, KARLA LATO, AS ADMINISTRATOR OF THE
ESTATE OF LEONARD LATO,

*Defendants-Appellees,*

*(Caption Continued on the Reverse)*

*On Appeal from the United States District Court
for the Eastern District of New York*

## REPLY BRIEF FOR PLAINTIFF-APPELLANT AND
## PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS

DRUKER, P.C.
1325 Franklin Avenue, Suite 225
Garden City, New York 11530
516-746-4300

CUOMO LLC
200 Old Country Road,
  Suite 2 South
Mineola, New York 11501
516-741-3222

*Attorneys for Plaintiff-Appellant and Plaintiffs-Counter-Defendants-Appellants*

*and*

Sentosa Care, LLC, Avalon Gardens Rehabilitation and Health Care Center, Prompt Nursing Employment Agency, LLC, Francris Luyun, Bent Philipson, Berish Rubinstein,

*Defendants-Counter-Claimants.*

# TABLE OF CONTENTS

1. Table of Authorities ……………………………………..          ii

2. Preliminary Statement …………………………………          1

3. Argument …………………………………………………          1

### POINT I

**THE TEN NURSES AND THEIR ATTORNEY NEED NOT
BE LEFT WITHOUT A REMEDY FOR THE
UNCONSTITUTIONAL AND ABUSIVE PROSECUTION
AS IMMUNITY DOES NOT PRECLUDE THEIR CLAIMS** 1

**A. The Prosecution of Felix Vinluan, supported by neither the law nor the facts,
demonstrates that the entire investigation was not only without justification, but was also
based upon the desire of Spota to use his office to investigate and harass the opponents of
the politically powerful Sentosa Organization** 7

**B. The Prosecution of the nurses was based entirely upon Lato concealing the salient law
and facts from the Grand Jury, further confirming the improper motive for this
prosecution** 11

**C. Absolute Immunity Should Not and Does Not Apply to This Case** 13

**D. The County and Sentosa Defendants Violated the Appellants' Rights During the
Investigative Phase of this Case and are Not Entitled to Qualified Immunity** 15

**E. Improper Actions of the District Attorney of Suffolk County in failing to supervise his
employee, and to allow the office of the District Attorney to be Abused, should lead to
Monell Liability of the County and the District Attorney** 22

**F. The Court Can Reach All of the Appellants' Arguments** 26

4. Conclusion …………………………………………….. 28

5. Certificate of Compliance ……………………………… 30

18

# TABLE OF AUTHORITIES

**Cases**

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ........................................................27

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–25, 108 S.Ct. 915 (1988) ........23

*District of Columbia v. Wesby*, 538 U.S.____, 138 S.Ct. 577, 590 (2018) ..............6

*Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014), ...............................................14

*Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988) ......27

*Intel Corporation Investment Policy Committee v. Sulyma,*
        ___U.S.___, 140 S.Ct. 768 (February 26, 2020)................................................10

*Jeffries v. City of New York,* 458 F.3d 549, 554 (2d Cir. 2005) ................................8

*Jett* v. *Dallas Independent School District*, 491 U.S. 701, 737,
        109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ............................................................23

*Lenzi v. Systemax, Inc.,* 944 F.3d 97, 109 (2d Cir. 2019)........................................28

*Malley v. Briggs*, 475 U.S. 335 (1986). .....................................................................5

*Matter of Rush v Mordue*, 68 NY2d 348, 354 [1986]) .............................................4

*Matter of Vinluan v. Doyle,* 60 A.D.3d 237, 2249-250 (2d Dept. 2009).................2

*Monell v. Dept. of Social Services,* 436 U.S. 658 (1978) ........................................22

*Morse v. Fusto,* 804 F.3d 548 (2d Cir. 2015............................................................21

*Paguirigan v. Prompt Nursing Employment Agency, LLC et. al.,*
        2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019)]. ...................................................7

*People v. McGee,* 49 N.Y.2d 48, 56-59 (1979). .......................................................17

*Pinaud v. County of Suffolk*, 52 F.3d 1139 (2d Cir. 1995) .....................................27

*United States v. Brunner,* 726 F.3d 299, 304 (2d Cir. 2013)..................................28

*Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), *cert. denied*
        507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 ................................................22

*Yee v. Escondido,* 503 U.S. 519, 534 (1992). ..........................................................28

*Zahrey v. Coffey*, 221 F3d 341, 347 (2d Cir. 2000)........................................ 17, 21

**Regulations**

Rule 29.2 of the Rules of the Board of Regents .......................................................20

## PRELIMINARY STATEMENT

Appellants submit this joint brief in reply to the Appellees brief in Opposition to Appellants' appeal.

## ARGUMENT

## POINT I

## THE TEN NURSES AND THEIR ATTORNEY NEED NOT BE LEFT WITHOUT A REMEDY FOR THE UNCONSTITUTIONAL AND ABUSIVE PROSECUTION AS IMMUNITY DOES NOT PRECLUDE THEIR CLAIMS

In taking the extraordinary and rarely-used step of prohibiting the prosecution of the Appellants, the New York Appellate Division, Second Department declared unequivocally that the indictment of the ten Nurses on its face, violated their Thirteenth Amendment right to be free from involuntary servitude. It further found that the indictment of their lawyer for merely giving them proper legal advice on its face, violated his First Amendment rights. The Court stated:

> The nurses in this case were engaged in private employment rather than the performance of public service. Moreover, while they possessed the education and training necessary to care for chronically ill patients, including children on ventilators, these skills are not so unique or specialized that they cannot be readily performed by other qualified nurses. Furthermore, although an employee's abandonment of his or her post in an "extreme case" may constitute an exceptional circumstance which warrants infringement upon the right to freely leave employment, the respondent

District Attorney proffers no reason why this is an "extreme case." The nurses did not abandon their posts in the middle of their shifts. Rather, they resigned after the completion of their shifts, when the pediatric patients at Avalon Gardens were under the care of other nurses and staff members. Moreover, while the indictment alleges that the nurses collectively resigned "knowing that their resignations and the prior resignations at other Sentosa Care facilities would render it difficult for Avalon Gardens to find, in a timely manner, skilled replacement nurses for Avalon Gardens' pediatric patients," it is undisputed that coverage was indeed obtained, and no facts suggesting an imminent threat to the well-being of the children have been alleged. Indeed, the fact that no children were deprived of nursing care played a large role in the Education Department's decision to clear the nurses of professional misconduct. Under these circumstances, we cannot conclude that this is such an "extreme case" that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer.

Indeed, the relevant Penal Law sections underlying these prosecutions proscribe the creation of risk to children and the physically disabled. Under the facts as presented herein, the greatest risk created by the resignation of these nurses was to the financial health of Sentosa.

*Matter of Vinluan v. Doyle,* 60 A.D.3d 237, 2249-250 (2d Dept. 2009).

Similarly, regarding Mr. Vinluan, the Court found:

As charged in the indictment, it is clear that Vinluan's criminal liability is predicated upon the exercise of ordinarily protected First Amendment rights. The indictment asserts that Vinluan committed the charged offenses by counseling the nurses to immediately resign from Avalon Gardens, and filing a discrimination claim on their behalf. Thus, the indictment affirmatively seeks to punish Vinluan for providing legal advice, which he avers was given in good faith. The District Attorney does not dispute that Vinluan acted in good faith but urges this court to conclude that his legal advice to the nurses was not constitutionally protected because he advised them to commit a crime. However, since the nurses' conduct in resigning cannot, under the circumstances of this case, subject them to criminal

prosecution, we cannot agree that Vinluan advised the nurses to commit a crime.

More importantly, regardless of whether Vinluan's legal assessment was accurate, it was objectively reasonable. We cannot conclude that an attorney who advises a client to take an action that he or she, in good faith, believes to be legal loses the protection of the First Amendment if his or her advice is later determined to be incorrect. Indeed, it would eviscerate the right to give and receive legal counsel with respect to potential criminal liability if an attorney could be charged with conspiracy and solicitation whenever a District Attorney disagreed with that advice. The potential impact of allowing an attorney to be prosecuted in circumstances such as those presented here is profoundly disturbing. A looming threat of criminal sanctions would deter attorneys from acquainting individuals with matters as vital as the breadth of their legal rights and the limits of those rights. Correspondingly, where counsel is restrained, so is the fundamental right of the citizenry, bound as it is by laws complex and unfamiliar, to receive the advice necessary for measured conduct. Moreover, by placing an attorney in the position of being required to defend the advice that he or she has provided, the State compels revelation of, and thus places within its reach, confidential communications between attorney and client. Such communications have long been held to be privileged in order to enable citizens to safely and readily secure "the aid of persons having knowledge of the law and skill[ ] in its practice". A prosecution which would compel the disclosure of privileged attorney-client confidences and potentially inflict punishment for the good faith provision of legal advice is, in our view, more than a First Amendment violation. It is an assault on the adversarial system of justice upon which our society, governed by the rule of law rather than individuals, depends.

*Id.* at 250-251. (Internal citations omitted). Even if the Court found the prosecution to be unconstitutional, there is still another step to overcome in determining whether a Writ of Prohibition is justified. That is the question of whether such a writ should be issued as a matter of discretion. In determining that this case was worthy of such an exercise of discretion, it stated:

> Upon weighing the relevant factors (*see Matter of Rush v Mordue*, 68 NY2d 348, 354 [1986]), we conclude that prohibition is an appropriate exercise of discretion. Where, as here, the petitioners are threatened with prosecution for crimes for which they cannot constitutionally be tried, the potential harm to them is "so great and the ordinary appellate process so inadequate to redress that harm" that prohibition should lie (*Matter of Rush v Mordue*, 68 NY2d at 354).

*Id.* at 251.

It must be noted, in evaluating the significance of this singular decision, that the Appellate Division did not even need to review the grand jury minutes to reach the conclusion that it was necessary to halt this misguided prosecution before trial, because the violations of the Appellants' constitutional rights were manifestly clear from the face of the indictment itself, rendering the prosecution unsustainable. The clarity of the applicable law and the Constitutional principles espoused by the Second Department explain why Appellee Spota gives short shrift to the Writ decision and the Appellee County ignores it completely.

While the prosecution of the Appellants was thereby ended after three agonizing years, the damages to them were severe, including fear, loss of income, illness, loss of reputation, adverse publicity, and other consequences. The former District Attorney of Suffolk County, his former Assistant District Attorney, and the County of Suffolk now rely upon various aspects of the law of prosecutorial immunity and the protection of prosecutorial employees to escape liability for their *intentional* violation of the Constitutional rights of the Appellants. Even though

prosecutorial immunity has been held to be broad, it is not without exceptions. This case cries out for a remedy for these individuals.

The prosecution under review was personally undertaken by the District Attorney of Suffolk County, at the behest of a politically-powerful owner of multiple nursing homes, and his attorney, despite the fact that they all knew that the Department of Education had already determined, after a thorough investigation, that the Nurses had not violated any obligation set forth in its regulations, and that their attorney was doing nothing more than giving his clients unexceptional legal advice. Respondents argue that it was not objectively unreasonable for Respondents to believe that there was a sufficient basis and probable cause to commence and conduct this investigation and prosecution, citing *inter alia, Malley v. Briggs*, 475 U.S. 335 (1986). But as the Supreme Court stated in *Malley*, immunity does not protect those who are "plainly incompetent" or "knowingly violate the law." No rational or competent prosecutor could have thought it lawful to investigate and prosecute health care workers who resign after the conclusion of their shift when no patients were harmed and when the agency specifically entrusted with overseeing their conduct had cleared them of all wrongdoing. No rational or competent prosecutor could have thought it lawful to investigate and prosecute an attorney, asked by a consulate to assist his countrymen, for rendering legal advice. It should be for a jury to determine

whether this investigation and prosecution was the product of plain incompetence or a knowing violation of the law.  While Appellants argue that it is the latter, if it is not the latter it can only be the former; there cannot be a third option.

The prosecution was undertaken by Mr. Spota's hand-chosen assistant who knew or should have known (as any reasonably competent prosecutor would have known) that this prosecution was devoid of basis in either the law or the facts.  An examination of the presentation to the Grand Jury, while arguably protected by absolute immunity, demonstrates beyond any doubt that (a) the entire commencement of the investigation and prosecution of the Appellees was baseless *ab initio*; (b) Mr. Lato was aware of several legal and factual deficiencies in this case, and (c) Lato took pains in his presentation to deceive the Grand Jury members, thereby securing an unjustified and unconstitutional indictment.  This situation is an extraordinary abuse of power that cries out for a remedy and presents the rare exception to immunity. In fact, it presents the exception to immunity enunciated by the Supreme Court in *District of Columbia v. Wesby*,  538 U.S.____, 138 S.Ct. 577, 590 (2018):  *"Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."*

**A.     The Prosecution of Felix Vinluan, supported by neither the law nor the facts, demonstrates that the entire investigation was not only without justification, but was also based upon the desire of Spota to use his office to investigate and harass the opponents of the politically powerful Sentosa Organization**

While hiding behind absolute immunity that purportedly covers the presentation of evidence to the Grand Jury, the Suffolk County Defendants, and Spota, ignore the fact that the very prosecution of Felix Vinluan was both factually and legally baseless, and was undertaken for the single, obvious purpose of participating in a scheme orchestrated by the Sentosa Defendants to intimidate not only the abused nurses at the Sentosa facilities, but anyone who might be unwise enough to come to their aid.[1]

The inclusion of an attorney, whose "crime" consisted of giving advice to his clients based upon the law and a correct reading of relevant contracts, is unprecedented.  According to Lato, the only explanation for his investigation and prosecution of Vinluan was that Mr. Vinluan became a target of the investigation when he allegedly "lied" about driving to Washington D.C. to file petitions with OCAHO.  Lato characterized this as a "lie" so transparent as to be "almost

---

[1] In spite of the dismissal of the indictments in this case, and the ruling by the New York State Supreme Court that the penalties set forth in the contracts with the Filipino nurses were illegal penalties, Sentosa continued to include them in their contracts and to harass and penalize Filipino nurses who attempted to resign.  This continued, bad faith conduct led to a Class Action Complaint by Filipino nurses, and summary judgment holding that the Sentosa Defendants violated the Trafficking Victims Protective Act, 18 U.S.C. 1589 et. sec.  *Paguirigan v. Prompt Nursing Employment Agency, LLC et. al.,* 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019)].

laughable" (A1387-1388, 1390-1391)[2].  Mr. Vinluan denied giving that explanation and instead testified that, in any event, he personally drove to Washington D.C. due to the importance of the matter.  Although, on summary judgment, a Court is not permitted to determine credibility, it also need not give credence to an obvious falsehood such as Lato's. *Jeffries v. City of New York,* 458 F3d 549, 554 (2d Cir. 2005).  That is especially true where, as here, not only is Lato's explanation incredible, but there is abundant evidence from which the motive of the investigation, and its clear abuses, can be discerned.  Lato admitted that he was present at the lunch meeting between Spota and Howard Fensterman, the politically connected Sentosa attorney. Lato claimed that despite focusing on the food and not on the conversation between Spota and Fensterman, he did somehow  manage to hear, and note, one salient fact, to wit:  that Fensterman was particularly anxious for Felix Vinluan to be prosecuted.  The importance of investigating and prosecuting Vinluan was also stated by Defendant Bent Philippson, the Sentosa principal, who stated, in his deposition in a related civil suit regarding why Mr. Vinluan was a defendant:

> Somebody did [induce the resignations] and <u>we believe</u> that he had his fingerprints all over it.  And being that he was and still is in direct competition with us in trying to recruit nurses from the Philippines, <u>we</u>

---

[2] Parenthetical references are as follows:  references to the Appendix are designated by "A" and a page number; References to the Sentosa Summary Judgment Papers are designated "Sentosa" with an Exhibit letter.

<u>believe</u> he had an ulterior motives [sic] here as well and, you know, that's what we believe (A1261-1262). [Emphasis added].

Even more importantly, in a meeting that Philippson held in one of Sentosa's other facilities to try to ensure that no other Filipino nurses resigned, a transcript of which was included in the Appellants' opposition to the motion for summary judgment, Philippson said, among other things:

> BP**:** u/i walked off shifts and abandoned u/i one, two, three just for your information, and if you have an open communication with them, it's good to get their words back to them because I know they just, they're young.  They just started off their careers here in the United States.  They took a wrong turn.  <u>Somebody misled them.  Who—we know already who misled them. We are fully aware.  And we are going to go after that person as well</u>**.**
>
> …
>
> You know, we were the first agency in the Philippines that didn't charge anybody a penny.  And since then, a lot of people have—you know, in order to compete with us—have followed suit.  <u>Here you're dealing with, actually, another Filipino agency and a lawyer who is trying to recruit these nurses and is just trying to make money off them.  And this lawyer himself is going to be in trouble because he's interfering with our contract—which is, again, illegal.  And for a lawyer to do that is stupid because he can lose his license to practice law in the United States as well, which I don't know why they're doing that, quite frankly speaking</u> (A1282-1288) (Emphasis added).

From the outset, the Sentosa Defendants demonstrated that their purpose in contacting the District Attorney, and their insistence on a prosecution was to intimidate the Filipino and other foreign nurses remaining in their employ, and to demonstrate that anyone, including lawyers,  who attempted to assist them in escaping that employ was also subject to harassment and prosecution, regardless of

the merits of any particular set of facts.  Even if this Court determines that  the

County Defendants and Spota are absolutely immune from civil liability for the

conduct in the Grand Jury, this does not mean that this conduct cannot be

examined to ascertain whether there was misconduct in the pre-prosecution,

investigative stage.

Such an examination reveals, beyond doubt, that there was no evidence

whatsoever at any time that Felix Vinluan committed a crime, and no valid

justification for this investigation and indictment.  The only "evidence" presented

against him was the advertisement of his services in the Philippines as an

immigration attorney, whose significance Lato created out of whole cloth, along

with the entirely fabricated testimony of Francris Luyun.  More importantly, a

mere reading of the small ad shows that Luyun lied about its content.  There was

no indication that Vinluan was a competitor of Sentosa as testified to. Nor was that

testimony even relevant.  Lato's repeated insistence (if believed) of his alleged

utter lack of preparation for this highly important Grand Jury presentation amounts

to at best "willful blindness" which the Supreme Court recently held can lead a

fact-finder to treat as "actual knowledge." *See, Intel Corporation Investment Policy

Committee v. Sulyma*,  ___U.S.___, 140 S.Ct. 768 (February 26, 2020).  In short,

there was no innocent, non-corrupt motive for the inclusion of Felix Vinluan in the

indictment and Lato and Spota's willful blindness can take the place of actual

knowledge of the falsity of much of the Grand Jury testimony as outlined in the Appellant's Brief.

### B. The Prosecution of the nurses was based entirely upon Lato concealing the salient law and facts from the Grand Jury, further confirming the improper motive for this prosecution

While, in contrast to the situation with Mr. Vinluan, Lato presented actual evidence against the Nurses, in the form of testimony that at best, consisted of half-truths, the entire investigation and presentation of evidence to the Grand Jury was based upon the concealment of the two most salient facts in this case: 1) that the Department of Education found that the nurses did not violate any of the regulations that formed the basis of the indictment; and 2) that no nurse walked off a shift. Again, the Grand Jury minutes demonstrate the bad faith in both the motive and the investigation of the facts of the case. A review of the minutes shows that Lato was at pains to conceal the fact that each nurse completed all shifts and properly handed off their patients to another caregiver before resigning, their sole obligation under the Education Law. Lato and his witnesses used the words "walked off" repeatedly, and when asked specific questions about whether anyone walked off a shift, Lato deferred or ignored the questions, leaving the Grand Jury with a false impression of the facts underlying that critical issue. (*See, e.g.,* A379-381, 498-499, 500, 501-502, 523-524, 596, 604-605, 609-611, 623). At the

beginning of the presentations, one juror specifically asked about this word usage, stating: "He [Investigator Warkenthein] used the term 'walked out' several times which seems to indicate they walked out in the middle of their shifts. I would like to know if they did in fact walk off the job during their shift" (A500). Knowing that the honest answer was that not a single Nurse had left during his or her shift, Lato declined to clear up the confusion, stating that the jurors would have to "get that from somebody else." *Id.* Thereafter, adding to the proof of malice and prejudice, and creating a false impression, Lato continued to use the term "walked out" frequently when referring to the resignations. This led the grand jurors to use the same improper and inaccurate terminology (A610).

Moreover, regarding the law, not only did Lato fail to present the exculpatory evidence of the Department of Education determination, but he, as he later admitted, he charged the Grand Jury with an erroneous instruction of the law, completely contrived by him. As Spota stated in his appellate brief, the office waited to pursue the prosecution until after the Department of Education ruled that the Nurses were not guilty of unethical conduct. Despite that determination by the governing agency, the District Attorney continued to investigate and indict the nurses and their attorney under the very same regulations they had been determined, under the lower standard of evidence, to have been innocent of violating. It is against this documented abuse of authority that the Court must

12

evaluate the question of whether the Appellees should be liable for these abuses to the individuals whom they intentionally injured.

### C. Absolute Immunity Should Not and Does Not Apply to This Case

As the discussion above shows, this is a case in which the plaintiffs should not be left without a remedy. The much-criticized concept of absolute immunity should be modified to allow a remedy for abusive prosecutions, undertaken in bad faith and, as in this case, without basis.

First, the Suffolk Defendants and Spota are not entitled to absolute immunity, because this prosecution was commenced without legal authority and should be regarded as void *ab initio*. The argument of the County Defendants and Spota seems to be that, because they were able to identify a crime, no matter how far-fetched and inapplicable to the facts of the case in the charge, the prosecution was therefore within their jurisdiction. The fact that the Appellees were able to identify a statute on which to hang their false and legally insufficient allegations should not retroactively immunize their action. There were simply no criminal acts committed by any of the Appellants, as the Second Department clearly and definitively held. Without even having the benefit of the Grand Jury minutes, the Court determined that the very verbiage of the indictment demonstrated that the Appellants were charged only with acts that they were entitled to perform in the exercise of their constitutional rights. A reading of the Grand Jury minutes further

illustrates the fact that this prosecution was without any basis whatsoever and was based upon the knowing presentation of false evidence created both by the Sentosa Defendants and Lato. The fact that Judge Doyle inexplicably sustained this prosecution should have no bearing upon this, in the face of both the Appellate Division Decision and the grand jury minutes. There was no crime, and there was never jurisdiction.

Even if the Court finds that there was jurisdiction, absolute immunity should not apply to this bad-faith unconstitutional prosecution.

In opposing Appellants' arguments regarding the application of absolute immunity, the Appellees seek to distinguish *Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014), extensively relied upon by the Appellants. They claim that, in this case, there was no evidence presented that Lato was responsible for the creation of false evidence. In order to make this assertion, they rely solely upon Lato's unsupported denial. As has been shown above, the Court is not required to give credit to a denial that is belied by the objective evidence *Jeffries v. City of New York* , *supra.* As was set forth in section A, *supra,* the facts do not support this denial. In fact, in constructing his case against Mr. Vinluan, Lato clearly created the false narrative regarding the advertisement Mr. Vinluan placed, as well as the perjurious testimony of Luyun. There is simply no other explanation for the fact that Luyun was both the only person to testify against Mr. Vinluan and the only

person to be permitted to testify to rank hearsay without objection from Lato. Moreover, when this is combined with the fact that the Department of Education found the nurses not to have violated the very regulations under which they were indicted, that Lato deliberately misled the Grand Jury about whether the nurses all completed their shifts before "walking off," and that Lato made up the law under which he charged the nurses and Vinluan (including, not incidentally, the law regarding conspiracy), it is clear that the doctrine of absolute immunity has been stretched too far. This Court should grant the Appellants relief.

D. **The County and Sentosa Defendants Violated the Appellants' Rights During the Investigative Phase of this Case and are Not Entitled to Qualified Immunity**

The County Defendants and Spota state correctly that the Court below found that there were no constitutional violations of the Appellants' rights during the investigative phase of the case, and thereby that the Court did not reach the issue of qualified immunity. Those findings were erroneous. Thus, this court should reach the issue of qualified immunity, and should hold that none of the defendants is entitled to it.

Part of the issue here is the fact, as noted by the District Court, that there is no clear demarcation between investigative conduct, not absolutely immune, and conduct in prosecuting a case, usually entitled to absolute immunity. However, the conduct that the Appellants rely upon in claiming that the Appellees do not have

qualified immunity is the creation of evidence by Lato.  The Court below held that there was insufficient evidence of this fabrication.  The Appellees depend upon that finding.  However, the showing by the nurses and Mr. Vinluan was on substantially stronger ground than "mere speculation."  As set forth above, this prosecution was aimed at Mr. Vinluan as much as it was at the nurses.  The prosecution possessed evidence that the nurses quit at the same time on the same day and had actual witnesses to that fact.  Of course, Lato shaved these facts so that the Grand Jury was deprived of exculpatory evidence and avoided answering inconvenient questions that would have exposed that that evidence represented, at best, half-truths.  However, there at least were actual witnesses to actual facts.  Regarding Mr. Vinluan, there were no witnesses and no facts.  Rather, these had to be entirely invented.  Lato used an advertisement to create an (entirely irrelevant) argument that Felix Vinluan might have had an ulterior motive for assisting the nurses.  However, even Lato understood that this would be insufficient, and he needed a witness.  Enter Luyun and his entirely made-up version of the facts. Lato's claim that he never met with any grand jury witness and had no idea what they were to testify to simply does not withstand the slightest scrutiny, especially (but not exclusively) regarding Luyun.  Indeed, a jury would be entitled to conclude that the parade of half-truths and untruths could not have emerged without orchestration and that Lato was the only one who could have orchestrated

it.  In order to persuade a grand jury to indict the nurses and Mr. Vinluan for acts

did not violate any existing laws and were not supported by the law or the facts, the

presenter must first have created the "facts" underlying this investigation.

Indicting an individual on made-up facts is a violation of their constitutional rights.

*Zahrey v. Coffey,* 221 F3d 341, 347 (2d Cir. 2000).  The Court is also reminded

that he also indicted the  Appellants on made-up law.

        Lato's charge to the Grand Jury was improper in almost every respect.

When asked if the defendants would all be charged "exactly the same," Mr. Lato

stated as follows:

> … there is a statute basically called acting in concert.   And you have the
> same federal law as well called aiding and abetting.  But essentially if three
> people are responsible for one person acting in a certain way, all there are
> liable as if they had done it themselves.  So, in other words, by way of
> example, say a person by the name of Joe, I want Joe to go rob a liquor
> store.  And my assistant also wants Joe to rob the liquor store, all three of us
> are liable even though Joe is the only one who physically did the robbery….
> For instance, if we are all doing this together, we are in a group, everyone is
> responsible for what the other person does. *And the theory of, again, if we
> are all in it together, conspiracy, each person is liable for the acts of his co-
> conspirator or agent.* (A1571-1572). (Emphasis added).

This, of course, is not the law of New York, because, unlike the Federal

system, New York does not hold co-conspirators liable for acts in furtherance of a

conspiracy.  *People v. McGee,* 49 N.Y.2d 48, 56-59 (1979).

Lato read, without any explanation, the section of the Education Law that

defined unprofessional conduct.  The indictment read that a nurse committed

unprofessional conduct when "the nurse abandoned a patient without making reasonable arrangements for the patient's continued care or when the nurse abandoned <u>employment at a healthcare facility</u> without giving reasonable notice to the facility <u>and under circumstances that seriously impaired the delivery of professional care to the patients</u>" (A563) (emphasis added).  Although Lato attempted to conceal this salient legal principle, the delivery of professional care to the patients was not seriously impaired, as the Sentosa defendants have repeatedly admitted, and as the Department of Education specifically found.  In addition, Lato charged the jury on patient abandonment, although he knew that no patient was abandoned within the meaning of the regulations.  He also knew that Thess Ramos had stayed for four hours, after her shift ended while waiting for her replacement to arrive  (A1111-1112).  When charging the jury about reasonable notice, Lato simply told them it was a question of fact, without providing any guidance as to what factors to take into account (A733-734).  Lato improperly conflated employer abandonment with patient abandonment, reading to the Grand Jurors a notice requirement for employer abandonment and implying that it was for patient abandonment.

Perhaps of even greater significance is that the nurses were not "employed at a healthcare facility."  Rather, they were employed and paid by "Prompt," an

employment agency that placed them at Avalon. As agency nurses, they had no obligation to give any notice to Avalon or, for that matter, to Prompt.

Lato read the definition of aiding and abetting from New York Penal Law §20.00, but then gave another erroneous charge that co-conspirators are liable for each other's crimes (A738-740).

Lato also gave a charge on "conscious avoidance" (A737-738). This led to the following exchange with a Grand Juror:

GRAND JUROR: In regard to blind willfulness, if they inquired that, let's say the abandonment – can I talk about the case?

MR. LATO: Yes.

GRAND JUROR: And they inquired to their legal representation, Mr. Vinluan, now is that blind willfulness anymore because they inquired and maybe said no it's not abandonment? I mean at what point these people are ignorant on the law, I'm going to assume so, they are asking a lawyer and he guides them the wrong way. Now, they have taken the time out to ask him, is that abandonment, and he says no. Where is their obligation at that point?

MR. LATO: That's for you to decide. True, this could be something for a person who is unsure of abandonment, and they ask another person whether in fact it abandonment is. Now, one thing that could be different in this case is, for instance, if Mr. Vinluan is involved in the case and has a vested interest, that is something for you to consider. On the other hand, you are right, because sometimes people are unsure what they are doing is criminal. And they ask advice and you may in fact determine in this case that the nurses were worried about abandonment and they asked somebody and were told and actually believed that it would not be abandonment and yes there has been some evidence here that in fact the nurses said they inquired of Mr. Vinluan and whether he gave them and honest opinion that's for you to decide. *But also, there is other evidence in this case that where the nurses*

*actually walked out, the director of the facility said you can't, I have all these sick children.*

So, in other words, you have to determine whether, you know, in this particular case what they actually believed to be the case. That's all. I can't help you. It's a question of fact. You are right sir, it's something for you to consider. (A742-744).

Thus, Lato gave the grand jury no guidance on the law regarding advice of counsel. He also gave an improper rendition of the facts, because there was no evidence that Susan O'Connor had said any such thing to the nurses, nor was there any evidence from which the grand jury could conclude that Vinluan had a vested interest in the case.

Lato also improperly charged the grand jury regarding patient and employer abandonment, and regarding endangering the welfare of a minor, or physically disabled person. Lato had available to him both Rule 29.2 of the Rules of the Board of Regents (A1430-1432) and the practice guidelines (A1434-1455), which define patient abandonment and employer abandonment. These clearly state that if a Nurse "*abandoned a patient without making reasonable arrangements for the patient's continued care,*" this may constitute "patient abandonment." (A1430) There was no evidence of any gap in the patient's continued care. All of the nurses handed over their patients to qualified nurses who took over at the end of the nurses- shifts. There was therefore no legal or factual basis for a charge of patient abandonment.

Therefore, with the violation of constitutional rights, and the erroneous legal charge to the grand jury, clearly established, the issue of qualified immunity must be examined.

In this case, the question of whether the Appellees violated clearly established constitutional rights is not even a close one. In *Zahrey v. Coffey, supra,* decided in 2000, this Circuit held that procuring an indictment of an individual based on fabricated evidence violated a right that was clearly known and established. The Court denied the prosecutor qualified immunity. Five years earlier, the Court arrived at the same result in *Hill v. City of New York, supra.* As recently as 2015, this Court reaffirmed this principal in *Morse v. Fusto,* 804 F.3d 548 (2d Cir. 2015). Moreover, as set forth above, the Appellate Division, Second Department had no question of the impropriety of the prosecution. Even without reading the Grand Jury minutes, the Court found that this prosecution was so improper and abusive that it had to be ended immediately.

Not surprisingly, the Appellees rely upon Judge Doyle's inexplicable decision sustaining the indictment as a basis for granting them qualified immunity, because he found that the presentation to the Grand Jury was sufficient, and declined to dismiss the indictment on constitutional grounds. While the Appellate Division held that Judge Doyle erred as to the existence of a constitutional violation on the face of the indictment, it should also be noted that Judge Doyle

was not presented with the evidence developed in discovery herein about the falsity of the Grand Jury presentation. Indeed, the Appellants had no way of knowing what evidence was presented to the Grand Jury until Judge Bianco granted the Appellants' motion to obtain the Grand Jury Minutes. Thus, Judge Doyle had no way of knowing that the evidence he found (incorrectly) to be sufficient was false and fabricated; Judge Doyle's decision can have no bearing on this constitutional violation.

### E. Improper Actions of the District Attorney of Suffolk County in failing to supervise his employee, and to allow the office of the District Attorney to be Abused, should lead to Monell Liability of the County and the District Attorney

Both the County and Spota have denied that they are liable for the violations of the Appellants' rights under *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978). They claim that all actions taken by them were in their capacity as State employees, and that actions were not taken pursuant to an official action of Suffolk County. To the contrary, the requirements for *Monell* liability were met by the Appellants in their opposition to the motion for summary judgment.

Appellants have previously demonstrated that their constitutional rights were violated during both the investigatory and the prosecutorial aspects of this case. Regarding *Monell* liability, even actions taken in a prosecutorial capacity, such as withholding exculpatory evidence, can lead to liability. *Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), *cert. denied* 507 U.S. 961, 113 S.Ct. 1387, 122

L.Ed.2d 762.  The Appellees have not seriously disputed the showing that this prosecution was based upon charges that are unconstitutional, and upon evidence that was either fabricated completely or deliberately framed in order to conceal exculpatory aspects of it.  Thus, the only issue regarding *Monell* liability is whether these actions were taken pursuant to an official policy of the County of Suffolk.

In their arguments in this appeal, the County and Spota gloss over the fact that Thomas Spota was, at the relevant time, the District Attorney of Suffolk County.[3]  Thus, any actions taken by him in his capacity as a County Employee must be regarded as actions pursuant to a municipal plan.  Spota was the sole person who was empowered to perform the actions regarding the office of the District Attorney as a Suffolk County office.  Actions taken by an official with policy-making authority must be regarded as actions of the County.  *See, e.g., Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–25, 108 S.Ct.  915 (1988).

Moreover, the evidence showed, not merely that Spota failed to supervise Lato, but that he abetted and encouraged his unconstitutional actions, of which he was fully informed at all times.  Spota assigned Lato, one of his top Bureau Chiefs

---

[3] Spota has since been convicted on Federal corruption charges under *United States v. McPartland,* 17 cr 587

to handle what would, under any other circumstance, be <u>at most</u> a simple misdemeanor matter. Moreover, Spota not only introduced Lato and the investigators to Fensterman, but he also showed unusual interest in this case, even editing the draft indictment (A1364, 1365, 1368-1369, 1373, 1376, 1379, 1386-1387) and having a private lunch with Lato, an investigator and Fensterman to facilitate the prosecution. It is true that Mr. Spota denied knowing about the investigation, and that that this evidence is based upon the testimony of Leonard Lato. However, unlike Lato's testimony about the targeting of Vinluan, this testimony was not inherently and provably incredible and is sufficient, at the summary judgment stage, to allow the Appellants to take the case to the jury.

The evidence presented by the Appellants showed the depth of Mr. Spota's involvement in this case. Lato, whom Spota hand-picked to manage this prosecution, was given the title of Chief of a newly-created Insurance Bureau because he refused to join the DA's Office unless he was a Bureau Chief, although he was brought in to work on "Special Projects" (A1362). Lato was an extremely problematic Assistant District Attorney, whose penchant for "one man" crusading made him uniquely unsuitable to conduct a fair investigation. Mr. Spota acknowledge that Lato was "virtually unsupervisable" (A1355-1356). He did not follow instructions and was rarely in the office because he spent much of his time in the United States Attorneys' office, from which his employment was previously

terminated.  Prosecutors in his bureau were significantly behind in their investigations because he was unavailable to supervise them.  They also observed that he made unsupported allegations of wrongdoing against others in the office (A1356).  Lato's erratic behavior was on display in *Kanciper v. Lato,* 13-cv-871, in which he was sued, *inter alia*, for violating the policy of the District Attorney's Office against "DA Shopping," personally prosecuting a case after it had been rejected by another ADA, explaining that the individual who rejected the original warrant was "lazy and stupid" (A1339-1340, 1363).   Moreover, his ungovernable and unreasonable temper was on display in this case.  When he became agitated by the questioning by counsel for the nurses in this case, Lato made extremely outrageous and profane remarks on the record.

However, faced with what he knew or should have known about Lato, Spota here failed to supervise Lato, and failed to protect individuals from his erratic and unlawful behavior.  To the contrary, according to Lato, Spota reviewed and acquiesced in the conduct.  Lato specifically testified that Spota reviewed and edited a draft of the indictment (A1364, 1365, 1368-1369, 1373, 1379, 1386-1387, 1400-1411).   As the Appellate Division found, no reasonable attorney, reading this indictment, would have failed to understand that the allegations in it sought to punish the Appellants for such "criminal acts" as contesting the validity of their

contract, filing a Federal action alleging discrimination, and obtaining legal advice. See, Indictment Paragraphs 11, 14, 15 and 17 a-c. (A 1403-1406).

Moreover, the Appellees dismiss the allegations regarding the rampant and systemic corruption in the Office of the Suffolk County District Attorney as irrelevant. Such evidence came both from newspaper articles and sworn statements by the prosecutors, and, most persuasively, from the conviction of Spota and one of his deputies of crimes relating to such corruption. Spota was convicted of using his office to benefit a protégé, both by preventing an investigation and by targeting those who were investigating him. Far from being irrelevant, these proven allegations demonstrate that the Suffolk County DA's office engaged in a pattern of abuse of the office for improper purposes. This abuse of the power of the office is the basis for liability of the Appellees under *Monell.*

### F.  The Court Can Reach All of the Appellant's Arguments

The County and Lato claim that some arguments made by the Appellants in this appeal, particularly regarding absolute immunity, were not properly preserved and cannot be reached by the Court. Appellants explicitly made the argument that the prosecution was without jurisdiction in their opposition to the motion to dismiss and opposed the grant of absolute immunity. While correctly stating that the Appellants did not move to reargue, they present no authority to support their

contention that the Appellants were obligated to do so.  That argument can be disregarded.

Regarding the argument to end absolute immunity, at least in cases such as this, the argument was preserved in the Court below. In fact, in their opposition to the motion by the Appellees herein to dismiss the complaint as to them, Appellants stated:

> The United States Supreme Court has already recognized that absolute immunity "leave[s] the genuinely wronged ... without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Imbler*, 424 U.S. at 427, 96 S.Ct. at 993. The Second Circuit, in a case involving this same District Attorney's Office, stated the application of this doctrine is "more than disquieting" in cases where there is inappropriate conduct on behalf of the government. *Pinaud v. County of Suffolk*, 52 F.3d 1139 (2d Cir. 1995). The Supreme Court has held that even when one can identify a common-law tradition of absolute immunity for a given function, the court must consider "whether §1983's history or purposes nonetheless counsel against recognizing the same immunity in §1983 actions." *Buckley v. Fitzsimmons*, 509 U.S.259, 269 (1993). The *Buckley* court added, "Not surprisingly, we have been "quite sparing" in recognizing absolute immunity for state actors in [§1983] context." *Id., citing Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988).
>
> This court should also be "quite sparing" and not allow the oppressive cloak of immunity to be extended to prosecutors investigating and commencing prosecutions that are unconstitutional from the very outset. (A115-116).

If this specific argument were deemed insufficient to preserve the argument made herein, the Court can reach those issues even if they were not properly preserved in the opposition to the motion to dismiss.  The question of what issues may be taken up and resolved for the first time on appeal is not one of jurisdiction; rather, it is

left to the sound discretion of the Court of Appeals. Thus, the Court can hear an issue for the first time on appeal if injustice would otherwise result. *Hormel v. Helvering,* 312 U.S. 552, 557 (1941). Once a Federal claim is presented, a party may make any argument in support of the claim and is not limited to the arguments presented to the Court below. *Yee v. Escondido,* 503 U.S. 519, 534 (1992). Such consideration is appropriate where an argument presents a question of law and does not necessitate an additional finding of fact. *Lenzi v. Systemax, Inc.,* 944 F.3d 97, 109 (2d Cir. 2019); *United States v. Brunner,* 726 F.3d 299, 304 (2d Cir. 2013). Thus, this Court is fully empowered to reach the issue presented herein.

## CONCLUSION

The Judgment should be reversed as to Defendants Thomas Spota, Leonard Lato, Office of the District Attorney of Suffolk County, and County of Suffolk, and the case remanded for trial of the Causes of Action against them.

Dated: September 1, 2020

Yours, etc.,

\James O. Druker
JAMES O. DRUKER, ESQ.
PAULA SCHWARTZ FROME, ESQ.
KASE & DRUKER, ESQS.
Attorneys for Appellants
ELMER JACINTO, JULIET ANILAO
HARRIET AVILA, MARK DELA CRUZ,
CLAUDINE GAMIAO, JENNIFER LAMPA,

RIZZA MAULION, JAMES MILLENA, MA
THERESA RAMOS and RANIER SICHON
1325 Franklin Avenue, Suite 225
Garden City, New York 11530
(516) 746-4300


\Oscar Michelen
OSCAR MICHELEN, ESQ.
CUOMO, LLC
Attorneys for Appellant FELIX VINLUAN
200 Country Road, Suite 2 South
Mineola, New York
(516) 741-3222

# CERTIFICATE OF COMPLIANCE

The brief was prepared on a computer in 14 point Times New Roman typeface. The brief is double-spaced except in sections of quotes from cases or facts which are single-spaced. The word count of the processing system of the computer used to create the brief states that the brief's word count is 7,697 words.


Respectfully Submitted

\Oscar Michelen
Oscar Michelen
Attorney for Appellant VINLUAN
CUOMO LLC
200 Old Country Road
Suite 2 South
Mineola NY 11501
516-741-3222
omichelen@cuomollc.com